118 F.3d 795
 155 L.R.R.M. (BNA) 2833, 326 U.S.App.D.C. 194,
134 Lab.Cas. P 10,043
 UNBELIEVABLE, INC., d/b/a Frontier Hotel & Casino, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Professional, Clerical & Miscellaneous Employees Local 995
and International Union of Operating Engineers,
Local 501, AFL-CIO, Intervenors.
 No. 96-1209.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 18, 1997.
Decided July 18, 1997.
 
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Michael A. Taylor, Washington, DC, argued the cause for petitioner, with whom Celeste M. Wasielewski was on the briefs.
 Daniel Michalski, Attorney, National Labor Relations Board, Washington, DC, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Frederick C. Havard, Supervisory Attorney, were on the brief.
 Adam N. Stern, Los Angeles, CA, argued the cause and filed the joint brief for intervenors. Lewis N. Levy entered an appearance.
 Before: WALD, GINSBURG, and ROGERS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge GINSBURG.
 Dissenting opinion filed by Circuit Judge WALD.
 GINSBURG, Circuit Judge:
 
 
 1
 The National Labor Relations Board determined that the Frontier Hotel & Casino committed an unfair labor practice by engaging in surface bargaining with two unions. The Board ordered the Frontier to reimburse the unions for their negotiation costs and to pay the litigation costs--primarily attorney's fees--incurred by both the unions and the NLRB General Counsel. The employer petitions for review, arguing that the Board erred in assessing negotiation costs, that the Board lacks the power to assess litigation costs, and that if the Board does have the power to assess litigation costs, then it erred in assessing them in this case. The Board cross-applies for enforcement of its order. We deny the petition and enforce the order with respect to the payment of the unions' negotiation costs, but grant the petition and deny enforcement with respect to the employer's payment of litigation costs.
 
 I. Background
 
 2
 Unbelievable, Inc., purchased the Frontier Hotel & Casino, located on the Las Vegas Strip, in 1988. The International Brotherhood of Teamsters and the International Union of Operating Engineers each represented certain groups of employees at the Frontier. Although the contracts between the Unions and the Frontier's previous owner had expired in 1987, Unbelievable continued to implement the terms of the expired contracts for some time. In April 1989, however, Unbelievable imposed new contract terms upon the two groups of employees represented by the Teamsters.
 
 
 3
 In May 1990 Unbelievable hired Joel I. Keiler to negotiate new contracts with both Unions. Keiler has long had a troubled history. He was briefly suspended from the practice of law in the District of Columbia, see Matter of Keiler, 380 A.2d 119 (D.C.1977), and he has run afoul of the Board on several occasions. See, e.g., Pepsi-Cola Bottling Co., 315 N.L.R.B. 882 (1994); CWI of Maryland, Inc., 321 N.L.R.B. No. 101, 1996 WL 395875 (1996). In March 1995 Keiler was suspended from practicing before the Board for one year because of his misconduct in representing another Las Vegas casino. See In re Joel I. Keiler, 316 N.L.R.B. 763. See also NLRB v. Unbelievable, Inc., 71 F.3d 1434 (9th Cir.1995) (sanctioning Frontier and Keiler for filing frivolous appeal).
 
 
 4
 After Unbelievable hired him, Keiler asked the Federal Mediation and Conciliation Service to set up meetings between the Company and the Unions. Keiler and the mediator each left messages for Robert Fox, who represented the Operating Engineers, and for Richard Thomas, who represented the Teamsters, but they were unable to set up a meeting. Although the Company had not yet informed the Unions that Keiler represented it, he sent letters to both Fox and Thomas in late June complaining about their lack of response to his overtures. He enclosed with the letters proposed contracts and wrote that if they did not contact him in order to arrange a bargaining session by August 1, then the Frontier would implement the proposed terms unilaterally.
 
 
 5
 The proposed contracts were significantly less attractive to the Unions than were their previous contracts. For example, the Company proposed to reduce the wages of some Teamsters to $6.50 per hour from $11.92 per hour, and to cut by 5% the wages of most employees represented by the Operating Engineers. Both proposed contracts would have made it difficult for an employee ever to receive holiday or vacation pay, eliminated the pension plan, and substituted a new health plan for those of the Unions.
 
 
 6
 Keiler and the Operating Engineers held three bargaining sessions from July to November. At the first meeting Fox told Keiler that the proposals were so outlandish that no union would ever agree to them and Keiler (according to Fox, whom the Board credited) responded that the Frontier's General Manager did not care and would not mind if the proposals led to a strike. Keiler did not consider the Union's counter-proposal, which closely paralleled the terms of the standard union contract in use on the Las Vegas Strip. Little happened at the second meeting. At the third meeting Keiler declared the two sides at an impasse and told Fox that the Company would implement its proposal, to which Fox responded that they were not at an impasse because the Company had not bargained in good faith. Keiler did later agree to retain the union's health and welfare plan, but on December 1, 1990 the Company implemented the other terms of its proposal.
 
 
 7
 Negotiations with the Teamsters followed a similar course. Of the discharge language in the proposal, Keiler said (according to Thomas, whom the Board credited), "It means we can virtually fire anybody for anything." Again Keiler indicated that the Frontier's General Manager wanted a strike so that he could replace the employees and get rid of the Unions. Keiler did agree to some changes--for example, in the vacation and holiday pay proposal--and the Union agreed to certain of the Company's minor proposals. After the union membership unanimously rejected the proposal in a secret ballot vote, Keiler told Thomas that the Frontier would implement its proposals unilaterally if the Teamsters did not accept them by November 1. Again Keiler later agreed that the Company would continue contributing to the Union's health insurance plan, and again on December 1 the Company implemented its other proposals.
 
 
 8
 The Unions filed unfair labor practice charges with the Board. After several days of hearings, an Administrative Law Judge issued findings and conclusions in May 1992. The ALJ held that the Company violated §§ 8(a)(1), (3), and (5) of the National Labor Relations Act, 29 U.S.C. §§ 151 et seq., by failing to bargain with the Unions in good faith and by unlawfully discharging a union supporter. The ALJ dismissed the charges that the Company had unlawfully withheld certain information from the Unions and that it had unlawfully withdrawn its health plan.
 
 
 9
 The charge that the Company had not bargained in good faith consumed the bulk of the hearing and of the ALJ's recommended order. Because he found that Keiler's testimony was not credible, the ALJ relied for his factual findings almost entirely upon the testimony of the General Counsel's witnesses. The ALJ concluded that Keiler's negotiation strategy was to reach an impasse so that the Company would be able to implement its proposals unilaterally and force the Unions into a strike. First, Keiler submitted a proposal that differed substantially from the previous contract and gave the Union only a month to respond to it. Second, the Company did not promptly inform the Unions that Keiler was representing it. Third, Keiler's use of the federal mediator "seems to [have been] designed only for the purpose of setting the foundation for an argument that it was the [Frontier] which was operating in good faith by first contacting the mediator." The ALJ, finding that Keiler, at the Frontier's direction, never really sought to reach agreement with the Unions, deemed the Company's conduct "classic surface bargaining."
 
 
 10
 The Board adopted the ALJ's factual findings and conclusions of law. Further, the Board held that it would require the Company to pay the Unions' negotiating expenses because the Company had "engaged in egregious and deliberate surface bargaining" with the Unions, which "unnecessarily diminished their economic strength." Unbelievable, Inc., 318 N.L.R.B. 857 (1995). The Board explained:
 
 
 11
 In cases of unusually aggravated misconduct ... where it may fairly be said that a respondent's substantial unfair labor practices have infected the core of a bargaining process to such an extent that their effects cannot be eliminated by the application of traditional remedies ... an order requiring the respondent to reimburse the charging party for negotiation expenses is warranted both to make the charging party whole for the resources that were wasted because of the unlawful conduct, and to restore the economic strength that is necessary to ensure a return to the status quo ante at the bargaining table.
 
 
 12
 Id. at 859.
 
 
 13
 Applying this standard to the ALJ's findings, the Board determined that through Keiler the Frontier had engaged in "deliberate and egregious bad faith conduct aimed at frustrating the bargaining process." Id. at 858. In particular, the Board stressed (1) Keiler's pre-negotiation conduct; (2) the wide gap between the status quo and the Company's initial proposals; and (3) Keiler's conduct at the bargaining table. The Board concluded that because Keiler "lost no opportunity to goad the Unions to strike," his "conduct rendered the bargaining between the parties merely a charade." Id. Accordingly, the Board ordered the Frontier to pay the expenses incurred by the Unions for their fruitless negotiations with Keiler.
 
 
 14
 The Board also required the Frontier to pay both the Unions' and the General Counsel's litigation expenses: the Company's presentation of frivolous defenses "depleted the [Unions'] resources" and "needlessly wasted" those of the Board; and compensation was required because "even a bargaining order accompanied by reimbursement of the charging party's negotiation expenses is insufficient to restore a charging party's economic strength and to ensure meaningful bargaining." 318 N.L.R.B. at 857, 862. The Board explained further that its policy is to order a respondent to pay the charging party's litigation expenses "only where the defenses raised by the respondent are frivolous rather than debatable." Id. at 860. Constrained by the principle that "Board orders must be remedial rather than punitive," id., the Board would not order a respondent to pay the charging party's litigation expenses if the respondent's defense turned upon an issue of credibility or if the respondent raised any defense that was not frivolous. In the present case, however, credibility was only technically at issue; Keiler's incredibility was so apparent that ordering the Company to pay the Unions' litigation expenses was consistent with the applicable principles, if not with the Board's precedents. Id. at 861. In addition, the Board noted that, although two of the charges filed against the Frontier were dismissed--indicating that the Company's defenses to those charges were hardly frivolous--the charges themselves were insignificant compared to the charge of surface bargaining, which had been the dominant subject of the hearing.
 
 
 15
 Because the Company's "sole defense" to the charge of surface bargaining rested upon Keiler's testimony, the Board focused upon his part in the hearing. Keiler's testimony, particularly during cross-examination, was "unresponsive, aggressive, and flagrantly disrespectful." 318 N.L.R.B. at 860. For example, when asked whether he was getting paid for his time testifying, Keiler responded, "Who knows what's going to happen? We could all be dead tomorrow." When shown a document and asked "How did you arrive at the writing on the right-hand corner here?" Keiler responded, "By airplane." The Board concluded that Keiler's conduct as a witness showed "his intent to make a charade of this proceeding." Id. The Board also stated that "Keiler's flagrantly unlawful course of conduct as the [Company's] agent in negotiations with the Unions" constituted a "further basis" for requiring the Frontier to pay the Unions' litigation costs (although not those of the General Counsel). Id. at 862.
 
 II. Analysis
 
 16
 The Company does not contest the Board's conclusions that it violated the NLRA by failing to bargain in good faith and by unlawfully discharging a union supporter. Accordingly, we shall enforce the Board's order insofar as it relates to those charges. In addition, we find substantial evidence in the record supporting the Board's finding that the Company engaged in "aggravated misconduct" during its negotiations with the Unions and we affirm the order directing the Frontier to pay the Unions' negotiation expenses. We also hold, however, that the Board lacks authority under the NLRA to order a respondent to pay the litigation expenses incurred by a charging party or by the General Counsel of the Board.
 
 A. Negotiation Expenses
 
 17
 The Frontier does not question the Board's authority to order a respondent to reimburse the charging party for negotiation expenses if the respondent's misconduct has been unusually aggravated and its unfair labor practices have infected "the core of the bargaining process to such an extent that their effects cannot be eliminated by the application of traditional remedies." The Company does argue, however, that there is not substantial evidence in the record considered as a whole to support the Board's findings of fact.
 
 
 18
 We uphold the Board on this point. As to credibility, we accept the ALJ's finding that Unbelievable lived up to its ill-chosen name. See Exxel/Atmos v. NLRB, 28 F.3d 1243, 1246 (D.C.Cir.1994) (ALJ's credibility determinations conclusive unless "patently unsupportable"). The testimony of the General Counsel's witnesses provides substantial evidence for the Board's finding that the Company did not intend to reach an agreement with the Unions. Keiler's statement that the General Manager of the Frontier wanted the Unions to strike so that he could replace the employees surely qualifies as "aggravated misconduct."
 
 
 19
 Nonetheless, the Company argues, the order should not stand because (1) the Company has no history of violating the Act; (2) it is not responsible for Keiler's behavior; and (3) the Unions engaged in misconduct as well. None of these challenges has any merit.
 
 
 20
 First, a respondent's labor history, good or bad, is not a factor that the Board need consider in determining whether to order the respondent to pay the charging party's negotiation expenses. The rationale for ordering a respondent to reimburse the charging party for its negotiation expenses is to restore the charging party to the status quo ante; the respondent's prior record of compliance with the Act is irrelevant to the propriety of such relief. Indeed, to consider the respondent's history would strongly suggest that the assessment of negotiation costs is a punitive rather than a compensatory measure. Cf. Republic Steel Corp. v. NLRB, 311 U.S. 7, 10, 61 S.Ct. 77, 78-79, 85 L.Ed. 6 (1940) (NLRA is remedial, not punitive).
 
 
 21
 Second, although the Company comes not to praise Keiler but to bury him, it cannot escape responsibility for the misconduct of its former attorney. The Frontier argues that the Board erred in focusing upon Keiler's conduct and not upon that of the Company itself in determining whether the employer must pay the Unions' negotiation costs. The Company's contention ignores the most basic principles of the law of agency. See O.W. Holmes, Jr., The Common Law 180 (1881) (principal bound by terms of contract formed by agent); Local 1814, Int'l Longshoremen's Ass'n v. NLRB, 735 F.2d 1384, 1394-95 (D.C.Cir.1984) (upholding Board in decertifying union due to illegal kickback agreement between union officials and employer), citing Restatement (Second) of Agency § 228(1) at 504 (1957). A company may not hire an attorney to represent it in negotiations, and then by claiming ignorance of the attorney's tactics avoid paying the price for the attorney's misconduct.
 
 
 22
 Finally, the Company argues that the Board should have refrained from granting the Unions an extraordinary remedy because they have unclean hands. For one thing, the Frontier points to the violent behavior of certain members of both Unions while on strike over the past five years; but the conduct of union members after negotiations broke down is not relevant to whether the Company is liable for the Unions' pre-strike negotiation costs. If the Unions are implicated in misconduct by strikers, then the Company may file its own charges against the Unions. For another, the Frontier argues that by insisting upon the terms of the standard Las Vegas Strip contract the Unions were partly to blame for the parties' failure to reach an agreement. The Unions had little reason to do more, however, when Keiler presented his proposals as non-negotiable diktats, see NLRB v. General Electric Co., 418 F.2d 736, 756-59 (1969) (take-it-or-leave-it approach to bargaining in context of anti-union animus violates Act), and informed the Unions that the General Manager of the Company hoped the Unions would strike so he could hire replacements. As it was, both Unions sought additional meetings even when Keiler could not wait to declare the negotiations at an impasse. In sum, substantial evidence in the record shows that inflexibility on the part of the Unions does not explain, let alone excuse, surface bargaining by the Company.
 
 B. Litigation Expenses
 
 23
 The Board claims that it has the authority, under § 10(c) of the NLRA, to order a respondent to pay the litigation costs--including principally the attorney's fees--incurred by both the charging party and the General Counsel.* The Company argues that the statute is insufficiently specific to authorize a departure from the "American Rule" that (with few exceptions) each side must bear its own legal expenses. See Arcambel v. Wiseman, 3 U.S. (3 Dall.) 306, 1 L.Ed. 613 (1796).
 
 1. Circuit precedent and the American Rule
 
 24
 For the first 35 years in which the Board administered the NLRA, it never claimed that it had the power to order a respondent to pay the attorney's fees of a charging party. Indeed, it declared that it would be inappropriate for the Board to assess attorney's fees "in the light of the basic principle[ ] that Board orders must be remedial not punitive ... [T]he public interest in allowing the Charging Party to recover the costs of its participation in this litigation does not override the general and well-established principle that litigation expenses are ordinarily not recoverable." Heck's, Inc., 191 N.L.R.B. 886, 889 (1971). Nonetheless, having been prompted by this court (when reviewing a different decision), to reconsider its policy, see Electrical Workers, IUE v. NLRB, 426 F.2d 1243, 1253 n. 15 (1970), the Board changed its mind, holding in Tiidee Products, Inc., 194 N.L.R.B. 1234 (1972), that it did have the authority to shift the burden of attorney's fees in certain cases. When we came to review the decision in Heck's, in which the Board had refused to assess attorney's fees against a respondent, the court took the occasion to pre-approve the contrary approach that the Board had later adopted in Tiidee. See Food Store Employees Union v. NLRB, 476 F.2d 546 (1973).** The court did not, however, analyze whether the Congress had given the Board the authority to order a respondent to pay attorney's fees. Instead, deferring even more than we would today understep II of the analysis in Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984), the court simply recounted that
 
 
 25
 the Board reasoned that the Congressional objective of achieving industrial peace through collective bargaining "can only be effectuated when speedy access to uncrowded Board and court dockets is available.... [I]n order to discourage future frivolous litigation, to effectuate the policies of the Act, and to serve the public interest we find that it would be just and proper" to order reimbursement of both the Board and the Union for their expenses incurred in the investigation, preparation, presentation, and conduct of the cases before it and the court.
 
 
 26
 Food Store Employees, 476 F.2d at 550-51, quoting Tiidee Products, Inc., 194 N.L.R.B. at 1236.
 
 
 27
 Then came Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), which, as a leading commentator put it, "alter[ed] dramatically the developing law on attorney's fees." 10 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2675 (1983). In Alyeska, the Supreme Court rebuffed efforts by plaintiffs and some courts alike to chip away at the American Rule, declaring categorically that "the circumstances under which attorney's fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine." 421 U.S. at 262, 95 S.Ct. at 1624. Nor may a court infer a congressional intent to override the presumption that the American Rule erects against the award of attorney's fees without "clear support" either on the face or in the legislative history of the statute. Rather, as the Supreme Court made clear again in Summit Valley Industries, Inc. v. Carpenters, 456 U.S. 717, 726, 102 S.Ct. 2112, 2117, 72 L.Ed.2d 511 (1982), a court may award attorney's fees only when expressly so authorized by the legislature. In the latter case the unanimous Court rejected the argument that § 303 of the Labor Management Relations Act, 29 U.S.C. § 187, authorizing the courts to award "damages" to an injured plaintiff, allowed for the award of attorney's fees as well: "In the absence of clear support for [that] construction in the language or legislative history of § 303 we decline to adopt such a broad exception to the American Rule." Id.
 
 
 28
 Although the Court in Summit Valley dealt not with the NLRA but with a different part of the LMRA and therefore did not overrule our decision in Food Store Employees, the Court later indicated that a lower court must consider the implication of Summit Valley for the Board's claim of authority to award litigation expenses. Specifically, when the Fourth Circuit became the only court to follow our holding in Food Store Employees, the Supreme Court granted certiorari, vacated the judgment, and remanded the case to the court of appeals for reconsideration in the light of Summit Valley. J.P. Stevens & Co., Inc. v. NLRB, 458 U.S. 1118, 102 S.Ct. 3505, 73 L.Ed.2d 1381 (1982), vacating 668 F.2d 767 (1982). (The case settled before the court of appeals had a chance to reconsider the issue.) At the very least, therefore, we are obliged to ask whether we should follow Food Store Employees in the wake of Summit Valley.
 
 
 29
 Clearly, before Summit Valley, we had held in Food Store Employees that the Board had the authority to assess a losing party for attorney's fees without finding the express statutory authorization that the Court would later, in Alyeska and Summit Valley, require in order to overcome the presumption that the American Rule applies. Reference to "the Congressional objective of achieving industrial peace through collective bargaining," 476 F.2d at 550, simply does not invoke a clear source of statutory authority for the award of attorney's fees. Although the petitioner emphasized the standard of clarity required under Summit Valley in its opening brief the Board tried to distinguish Summit Valley with only the inapt observation that, in purported contrast to § 303, "the express terms of Section 10(c) ... do not limit the Board's broad authority to order appropriate remedial measures to effectuate the policies of the Act." At oral argument the Board was understandably quick, therefore, to embrace Judge Wald's observation that Summit Valley may not be controlling here because that case involved attorney's fees awarded by a court, whereas § 10(c) of the NLRA broadly authorizes an administrative agency to remedy unfair labor practices. We see nothing in the rationale of Summit Valley, however, to indicate that it does not apply equally to a statute granting remedial power to an administrative agency.
 
 
 30
 On the contrary, the wide range of cases since Food Store Employees in which the Supreme Court has reaffirmed its adherence to the American Rule gives us reason to believe that the presumption against fee-shifting does apply to the NLRA. See, e.g., Runyon v. McCrary, 427 U.S. 160, 183-85, 96 S.Ct. 2586, 2600-02, 49 L.Ed.2d 415 (1976) (court may not award attorney's fees under 42 U.S.C. § 1981 for want of express authority; nor is implied authority for such award provided by generalized command of § 1988 to furnish suitable remedies to vindicate rights conferred by Civil Rights Acts); Alyeska, 421 U.S. at 271, 95 S.Ct. at 1628 (reversing grant of attorney's fees to plaintiffs as private attorneys general because only Congress, not courts, can authorize exception to American Rule); F.D. Rich Co. v. Industrial Lumber Co., 417 U.S. 116, 126, 94 S.Ct. 2157, 2163-64, 40 L.Ed.2d 703 (1974) (reversing award of attorney's fees under Miller Act because it does not "explicitly provide for an award of attorneys' fees to a successful plaintiff"); cf. Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) (discussed below).
 
 
 31
 Since the Supreme Court first made it clear that only the Congress and not the courts can override the American Rule, the Congress has in recent years expressly authorized fee-shifting in a number of statutory provisions, starting with the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, which was passed in direct response to the Alyeska decision. See Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983); see also 42 U.S.C. § 12205 (1990) (fee shifting under Americans With Disabilities Act); 29 U.S.C. §§ 216(b) and 626(b) (fee shifting under Age Discrimination in Employment Act).
 
 
 32
 The Supreme Court, in turn, treats congressional silence in a particular statute as an indication that the legislature did not intend to authorize fee shifting. For example, in Key Tronic Corp. v. United States, 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), the Court held that § 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9607, does not authorize the award to a private litigant of attorney's fees associated with bringing a cost recovery action. Yet § 107 provides rather expansively that a private litigant may recover "any ... necessary costs of response" " and even defines "response" to include "enforcement activities related thereto." The Court, noting its "adherence to a general practice of not awarding fees to a prevailing party absent explicit statutory authority," and observing that the Congress had expressly provided for the award of attorney's fees in certain amendments to the CERCLA, at 818-19, held that § 107 does not provide for the award of attorney's fees "with the clarity required by Alyeska." Cf. Alyeska, 421 U.S. at 262, 95 S.Ct. at 1624 (that Congress expressly provides for award of attorney's fees in some statutes is evidence that it did not intend to provide for attorney's fees in other statutes). In Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), the Supreme Court again indicated the importance to be attached to the absence of explicit authority for fee shifting in a particular statute (or its legislative history). In that case a student brought a successful claim under the Education for the Handicapped Act, which does not provide for fee shifting, and also under 42 U.S.C. § 1983 and a provision of the Rehabilitation Act, both of which do provide for fee shifting. Disallowing the student's claim for attorney's fees, the Court reasoned that where the EHA is available to a child asserting a right to public education, that statute provides his sole remedy; to allow him to proceed under provisions that allow for the recovery of attorney's fees would undercut the decision by the Congress not to provide for fee shifting in the EHA. Id. at 1012-13, 1020-21, 104 S.Ct. at 3468-69, 3472-73.
 
 
 33
 Moreover, the mechanics of an action to enforce the NLRA suggest that the requirement that the authority to award attorney's fees be express applies a fortiori to this statute. The reason is simply this: the charging party's participation in the litigation is strictly voluntary. The union, employee, or employer filing a charge with the Board need not play any role in the proceedings beyond serving the respondent with a copy of the charge. 29 C.F.R. §§ 101.2, 101.4. Although the charging party may, if the General Counsel issues a complaint, participate in the hearing, 29 C.F.R. § 101.10, nothing in the Act or in the Board's regulations requires it to do so. If the General Counsel calls the charging party as a witness, as he called certain union officials in this case, then the General Counsel must pay the witness a fee for his time. 29 C.F.R. § 102.32. In short, a charging party need not incur any litigation expense. Of course, the charging party may (and often does) intervene in the proceedings before the Board, but it does so as a volunteer, not a party haled into litigation willy-nilly. We think it would be passing strange for the court to hold that, although a statute authorizing an individual to bring a court case at his own expense will not be read to authorize an award of attorney's fees absent clear Congressional intent, a statute that provides a federal agency to prosecute a case on behalf of a charging party will be read to authorize the agency to award that party--should it choose to intervene--its attorney's fees based solely upon the agency's general remedial authority "to take such affirmative action as will effectuate the policies" of the Act. 29 U.S.C. § 160(c).
 
 
 34
 In sum, since our decision in Food Store Employees the Supreme Court has emphasized in several contexts that a federal court is to apply the American Rule unless the Congress has explicitly said otherwise. Nothing in the Court's decisions suggests that the standard set for the courts does not apply equally to a statute giving a federal agency rather than an individual the right to institute proceedings. We did not apply such an exacting standard in Food Store Employees; in the light of Alyeska and Summit Valley, however, we must do so now.
 
 
 35
 2. The search for "clear support" in § 10(c)
 
 
 36
 Looking at the issue afresh, then, we find no support for the Board's position in the terms of the NLRA, in its legislative history, or in Supreme Court precedent interpreting the extent of the Board's remedial discretion. Section 10(c) of the NLRA provides:
 
 
 37
 If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act].
 
 
 38
 29 U.S.C. § 160(c).
 
 
 39
 In its opinion the Board acknowledges that this section, like the statutory provision at issue in Summit Valley, "does not expressly provide for the recovery of attorney's fees." 318 N.L.R.B. at 863. Nevertheless, the Board argues that we should defer to its interpretation of its authority under § 10(c) of the Act. We can defer only so far as "that interpretation is rational and consistent with the statute." NLRB v. Food & Commercial Workers, 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987). It is not rational to interpret congressional silence in § 10(c) as implicitly sanctioning fee shifting when the Supreme Court has expressly stated that fee shifting is allowed only when a statute provides "clear support" for such authority. According to the Board, however, because the NLRA "refrains from particularizing the scope of the Board's remedial powers," and because it "contemplates the exercise of broad discretion by the Board in fashioning a range of remedies suitable to remedy various unfair labor practices," the award of attorney's fees is not inconsistent with the statute. 318 N.L.R.B. at 863. The absence of a prohibition is not, however, equivalent to an authorization, much less "clear support" therefor. As the Supreme Court put the matter in Runyon, to determine that the Congress "intended to set aside this longstanding American rule of law" there must be more in the statute than "generalized commands" or a "broad [remedial] commission." 427 U.S. at 185-86, 96 S.Ct. at 2602.
 
 
 40
 The Board also relied upon the legislative history of the NLRA, but it succeeded only in showing that it does not have Clio on its side in this matter. The Senate Labor Committee considered two versions of what is now § 10(c). One version, S. 2926, provided a list of rather specific remedies. The second version, S.1958, was more general. The Committee pointed out that "to substitute express language such as reinstatement, back pay, etc., necessarily results in narrowing the definition of restitution, which may include many other forms of action." Comparison of S. 2926 (73rd Congress) and S.1958 (74th Congress), Senate Comm. Print, reprinted in 1 Leg. Hist. 1360 (1935). Incredibly, however, immediately after acknowledging the Committee's point, the Board asserted that, "[a]lthough the final bill in fact substituted 'reinstatement of employees with or without backpay' for 'restitution,' the change was made without any suggestion of an intention to narrow the discretion of the Board in remedial matters." 318 N.L.R.B. at 863. The Congress's substitution of the phrase "reinstatement of employees with or without backpay" in place of "restitution" is hardly evidence (let alone clear support for the proposition) that the Congress intended to authorize the Board to order a respondent to pay the attorney's fees of the charging party and the Board. Cf. International Union of Electrical, R. & M. Wkrs., 502 F.2d at 353 n. * (individual opinion of J. MacKinnon) ("in all the 39 years of legislative history surrounding section 10(c), none of it gives any support for the interpretation that Congress intended to allow the Board to award attorney fees and litigation expenses to prevailing parties").
 
 
 41
 Because neither the plain text nor the legislative history of § 10(c) provides "clear support" for the authority of the Board to order the payment of attorney's fees, the Board can argue only that the phrase "such affirmative action ... as will effectuate the policies of the Act" has been interpreted so broadly by the Supreme Court that it encompasses that remedy in this case. Of course, the Board's remedial power is not limited to the single example of affirmative action instanced in the statute, namely, reinstatement with or without backpay. Still, the other remedies that the Supreme Court has approved are closely related to the expertise of the Board and to its statutory mission. For example, in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Court held that the Board may issue a bargaining order when (1) a union has shown by informal means that it enjoys majority support among the employees in a unit and (2) the employer's unfair labor practices have so tainted the atmosphere with coercion of the employees as to make it unlikely that the Board could hold a fair election. In contrast, by imposing an award of attorney's fees the Board moves away from its expertise in labor relations and exercises a discretionary power entrusted to a court only when specifically legislated.
 
 
 42
 The Board's primary justification for ordering the Frontier to pay the litigation costs of its adversaries--namely, its presentation of a frivolous defense to the unfair labor practice charges--is especially problematic for the simple reason that it is not itself an unfair labor practice to present a frivolous defense to an unfair labor practice charge. A Gissel bargaining order responds directly to an unfair labor practice, the refusal to bargain. An award of attorney's fees against a party that has presented a frivolous defense effectuates the policies of the Act only indirectly. Relatedly, the Board strays from its area of expertise when it determines whether fee shifting is appropriate in a particular case. In determining whether to order an employer to bargain with a union, the Board addresses delicate issues of labor-management relations clearly within its delegated purview and its field of expertise. By contrast, in considering whether to order an employer to pay the attorney's fees of a union (or vice versa), the Board focuses not upon the dynamics of the workplace but upon the employer's (or union's) conduct in litigation. See Scheduled Airlines Traffic Offices, Inc. v. Department of Defense, 87 F.3d 1356, 1361 (D.C.Cir.1996) (court does not defer to agency decision in matter outside of agency's expertise).
 
 
 43
 Not only is there a problem with the nature of the conduct at which the Board's award of attorney's fees is aimed, there is also a problem with the limited purpose for which the Board may award any remedy. The Board gives two rationales explaining why its order effectuates the policies of the Act, but neither of these, nor their combination, is sufficient to overcome the American Rule. First, the Board states that the company's "reliance on frivolous defenses in its litigation of these allegations ... depleted the Charging Parties' resources." 318 N.L.R.B. at 857. To the extent that the Board is relying upon the idea that a party is not made whole unless it recovers its attorney's fees, however, that is but a criticism of the American Rule--indeed, a criticism that the Supreme Court has heard and rejected. See Summit Valley, 456 U.S. at 724-25, 102 S.Ct. at 2116-17 ("Even assuming that attorney's fees are necessary to achieve full compensation, this justification alone is not sufficient to create an exception to the American Rule in the absence of express congressional authority"), citing F.D. Rich, 417 U.S. at 128-29, 94 S.Ct. at 2164-65 ("This argument merely restates one of the oft-repeated criticisms of the American Rule"). The Board's "make whole" rationale, therefore, does not show that fee shifting effectuates the policies of the Act.
 
 
 44
 The Board's other reason for ordering a respondent to pay the attorney's fees of the charging party, to discourage frivolous litigation, is essentially punitive. 318 N.L.R.B. at 860. As counsel put the matter at oral argument, the Board requires the power to tax a party with attorney's fees in order "to ensure that its processes are not abused by parties asserting frivolous defenses" and "to keep its docket clear." To the extent that the power to shift fees is justified as a deterrent to frivolous litigation, however, the power is punitive and therefore beyond the Board's delegated authority. See Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973) (underlying rationale of fee shifting in cases of bad faith is punitive).
 
 
 45
 The Supreme Court has consistently invalidated Board orders that are not directly related to the effectuation of the purposes of the Act or are punitive. In Consolidated Edison v. NLRB, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938), the Court held that the Board lacks authority to invalidate a contract between a labor organization and a company because the "authority to order affirmative action does not go so far as to confer a punitive jurisdiction" upon the Board. Thus, the Board may not "inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices, even though the Board be of the opinion that the policies of the Act might be effectuated by such an order." Id. at 235-36, 59 S.Ct. at 219. Likewise, in Republic Steel Corp. v. NLRB, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940), the Court invalidated a Board order requiring an employer to deduct from back pay the amount of money that employees had earned on work relief projects prior to their reinstatement and to pay the same amount to the government agencies that had employed the workers. The Court rejected the Board's claim to authority because neither possible rationale for the order--to further the programs to which the money would go or to punish the employer--is consistent with "the spirit and remedial purposes of the Act." Id. at 11, 61 S.Ct. at 79. Finally, in Carpenters Local 60 v. NLRB, 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961), the Court struck down as punitive a Board order that a union reimburse its members for all dues and fees that it had collected under an unlawful closed-shop agreement. As Justice Harlan's concurrence in that case makes clear, in order to uphold a remedy, the Board "must show more than that the remedy will tend to deter unfair labor practices." Id. at 658, 81 S.Ct. at 879. See also Grondorf, Field, Black & Co. v. NLRB, 107 F.3d 882, 888 (D.C.Cir.1997) (Board order must be remanded if it may be punitive rather than remedial). Whether the Frontier's misconduct lay in its presentation of a frivolous defense to an unfair labor practice charge or in its misconduct during bargaining, or both, a fair reading of the Supreme Court's decisions suggests to us that the order that the employer pay its adversaries' attorney's fees is punitive and is not directly related to effectuating the policies of the Act.***
 
 III. Conclusion
 
 46
 The American Rule is "deeply rooted in our history and in congressional policy." Alyeska, 421 U.S. at 271, 95 S.Ct. at 1628. Therefore, we may not lightly allow an administrative agency, any more than a court, to depart from the Rule; rather, there must be "clear support" for the agency's claim that the Congress authorized the agency to order one party to pay the fees of another party or of the agency itself. Finding no such support in the terms or the legislative history of § 10(c) of the National Labor Relations Act, we conclude that the Board lacks that authority. We note with interest, moreover, that notwithstanding the protestations of our dissenting colleague, neither she nor the Board can cite a single case, aside from our own pre-Alyeska precedent, in which a court has upheld any agency order shifting responsibility for attorney's fees in an agency proceeding.
 
 
 47
 Accordingly, we hold that although the Board may order a respondent to pay the negotiation costs incurred by a charging party if it properly finds, as it did here, that the respondent engaged in aggravated misconduct, the Board may not order a respondent to pay the litigation expenses incurred by the charging party or by the General Counsel in the subsequent unfair labor practice proceeding. Consistent with the foregoing opinion, the Company's petition and the Board's cross-application are each granted in part and denied in part.
 
 
 48
 So ordered.
 
 WALD, Circuit Judge, dissenting in part:
 
 49
 I dissent from the panel's reversal of the Board's assessment of attorney's fees against Unbelievable, Inc., for its frivolous defense against the charge of bad faith bargaining before the Board.
 
 
 50
 The National Labor Relations Board ("NLRB" or "Board") first ordered a respondent to reimburse litigation costs, including attorney's fees, in proceedings before it 25 years ago, citing its statutory authority to effectuate the policies of the National Labor Relations Act ("NLRA" or "Act"). In Tiidee Products, Inc., 194 N.L.R.B. 1234, 1236-37 (1972) (supplemental decision), the respondent had engaged in "patently frivolous" litigation and "[t]he policy of the Act to insure industrial peace through collective bargaining can only be effectuated when speedy access to uncrowded Board and court dockets is available." Id.[1] We approved the action of the Board in awarding litigation costs for its proceedings under such circumstances in Food Store Employees Union v. NLRB, 476 F.2d 546 (D.C.Cir.1973), rev'd in part on other grounds, 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974) ("Food Store").
 
 
 51
 Soon thereafter, in International Union of Elec., Radio and Mach. Workers v. NLRB, we reaffirmed the Board's authority to award attorney's fees in similar circumstances. International Union of Elec., Radio and Mach. Workers v. NLRB, 502 F.2d 349 (D.C.Cir.1974) (enforcing Tiidee Products, Inc., 194 N.L.R.B. 1234 and Tiidee Products, Inc., 196 N.L.R.B. 158 (1972)), cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975). Judge MacKinnon, writing for the court at that time, acknowledged that "Food Store in large measure controls our disposition of the issue in this case," id. at 352-54, and said in a separate statement that Food Store foreclosed debate on whether the Board has authority to award litigation costs. Id. at 352 n. *. Indeed, it is still the rule 23 years later that panels of this court are bound by controlling circuit precedent--even if the panel does not agree with it, see United States v. Kolter, 71 F.3d 425, 431 (D.C.Cir.1995) (Ginsburg, J.)--and a panel decision may be overruled only by the full court, sitting in banc, or the Supreme Court. See, e.g., LaShawn A. v. Barry, 87 F.3d 1389, 1395 (D.C.Cir.1996).
 
 
 52
 The majority contends nonetheless that Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), and Summit Valley Indus., Inc. v. Carpenters Local 112, 456 U.S. 717, 102 S.Ct. 2112, 72 L.Ed.2d 511 (1982), release us from the obligation to follow precedent upholding the NLRB's authority under section 10(c) of the NLRA to award litigation expenses for frivolous positions because those intervening Supreme Court rulings require an express statutory authorization for fee-shifting that cannot be found in section 10(c). In my view, these cases do not overrule Food Store, and I would again uphold the Board's assessment of attorney's fees here.
 
 
 53
 In Alyeska, the Supreme Court held that a successful plaintiff acting as a "private attorney general" in bringing suit to bar construction of the trans-Alaska pipeline under the Mineral Leasing Act, 30 U.S.C. § 185, and the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., is not entitled to attorney's fees even though the litigation may have implemented important public policy goals. Alyeska, 421 U.S. at 263-64, 95 S.Ct. at 1624-25. The Court explained that "it would be difficult ... for the courts, without legislative guidance, to consider some statutes important and others unimportant and to allow attorney's fees only in connection with the former," id. at 264, 95 S.Ct. at 1625, a much narrower rule than the majority suggests. Critically, the Court explicitly left intact the equitable power to award attorney's fees under pre-existing common-law exceptions to the American Rule against fee-shifting. Id. at 257-58, 95 S.Ct. at 1621-22; see, e.g., Central Railroad & Banking Co. v. Pettus, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885) (common fund); Toledo Scale Co. v. Computing Scale Co., 261 U.S. 399, 426-28, 43 S.Ct. 458, 465-66, 67 L.Ed. 719 (1923) (willful disobedience of a court order); Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962) (bad faith).[2]
 
 
 54
 In Summit Valley, the Supreme Court did decide that section 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187, does not authorize a court to award attorney's fees incurred during prior proceedings before the Board as a remedy in a private damages action. The remedial scheme contemplated by Congress in enacting section 10(c) of the NLRA, however, is dramatically different than section 303 of the LMRA. Section 303 contains an explicit damages provision that entitles an employer who has been injured "in his business or property" by a union's unfair labor practice to "recover the damages by him sustained and the cost of the suit." 29 U.S.C. § 187. Starting with the premise that, under the American Rule, the ordinary meaning of "damages" does not include attorney's fees, the Supreme Court examined the legislative history of section 303(b) and found a Senate floor exchange persuasively indicating that the term "damages" was not intended to include attorney's fees in this section either. As the Sixth, Seventh and Ninth Circuits have recognized, Summit Valley "rested ... on factors peculiar to section 303(b) [of the LMRA], which ... expressly states its remedies and was not intended to encompass attorney's fees, according to the 'persuasive evidence' of congressional intent." Bennett v. Local Union No. 66, Glass, Molders, Pottery, Plastics and Allied Workers Int'l Union, AFL-CIO, 958 F.2d 1429, 1440 n. 9 (7th Cir.1992); see Wilson v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, AFL-CIO, 83 F.3d 747, 754 (6th Cir.), cert. denied, 519 U.S. 1041, 117 S.Ct. 610, 136 L.Ed.2d 535 (1996); Zuniga v. United Can Co., 812 F.2d 443, 454-55 (9th Cir.1987). In short, none of the intervening cases relate to the Board's authority under the NLRA to award litigation expenses as a remedy and as a deterrent to prevent bad faith abuse of its processes.
 
 
 55
 In a case like this one, where an employer has flagrantly refused to collectively bargain in good faith, a union is compelled to vindicate its statutory rights in proceedings before the Board. As the Board itself has recognized, "[a]n aggrieved party's outlay of legal ... expenses is likely to be a prime ingredient in or motivation behind, a refusal to bargain for which there is no arguably meritorious justification. Logic suggests little reason for such a refusal other than the belief that to do so may create an economic imbalance beneficial to the party undertaking the refusal." Wellman Industries, Inc., 248 N.L.R.B. 325, 326 (1980); see Seattle-First National Bank v. NLRB, 638 F.2d 1221, 1227 n. 9 (9th Cir.1981) (surface bargaining by employer involves use of economic power to "talk a union to death"). Wasting the union's time and depleting its resources through presentation of a frivolous defense at a Board proceeding is a tactical maneuver designed to deepen the economic wound already caused by the surface bargaining. Koval Press, Inc., 241 N.L.R.B. 1261, 1263 (1979) ("The only logical inference to be drawn from [presentation of a frivolous defense is that Respondent] seeks to delay the proper effectuation of the policies of the Act by its unlawful refusal to bargain...."). It is merely continuation of the same bad faith recalcitrance employed at the bargaining table in a new forum. A diehard respondent can go up the chain of decisionmaking causing greater economic burdens to the union at each stage by employing dilatory tactics during the administrative adjudication by the Administrative Law Judge ("ALJ"), the Board's review of the ALJ's recommendation, and, finally, appeal of the Board's order to a United States Court of Appeals. The whole process can take years. In addition to exhausting the charging party's legal war chest, the delay often leads to employee frustration and eventual loss of employee support due to attrition or loss of confidence in a seemingly ineffectual union, and it often permits continued employer anti-union activity. Cf. Ex- Cell-O Corp., 185 N.L.R.B. 107, 108 (1970). Ironically, by the purposeful presentation of an entirely frivolous defense, an employer turns the Board's processes into an instrument of its own unlawful conduct. Even though the union wins the usual remedy for surface bargaining--an order to bargain in good faith--the impact of an employer's persistent and pervasive bad faith over years of administrative proceedings may effectively dissipate the impact of the order.
 
 
 56
 The majority readily admits the force of the evidence that led the Board to conclude that Unbelievable, Inc., "engaged in egregious and deliberate surface bargaining" in order to diminish the charging parties' economic strength and relied on "frivolous defenses in its litigation" in order to "further deplete[ ] the Charging Parties' resources and needlessly waste[ ] the resources of [the NLRB]." The Board characterized Unbelievable's surface bargaining as "flagrant, aggravated, persistent, and pervasive" misconduct, and described the deliberate adherence to frivolous defenses as "egregious bad faith." While relying on section 10(c) of the NLRA as its principal authority for awarding attorney's fees against Unbelievable, Inc., the Board expressly noted such a remedy paralleled the bad faith exception to the American Rule as well.[3] Such a remedy is undoubtedly "rational and consistent with the statute." NLRB v. Food & Comm'l Workers Union, 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987).
 
 
 57
 Section 10(c) directs the Board, upon finding that a respondent has engaged in unfair labor practices, to issue an order requiring the respondent to cease and desist from the unfair labor practices and authorizes it further "to take such affirmative action including the reinstatement of employees, with or without back pay, as will effectuate the policies of this Act...." 29 U.S.C. § 160(c). The Act's policies include "encouraging the practice and procedure of collective bargaining and ... protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives ... for the purpose of negotiating the terms and conditions of their employment...." 29 U.S.C. § 151.
 
 
 58
 While section 10(c) does not specifically list reimbursement of litigation expenses before the Board as a remedy for unfair labor practices, Congress deliberately drafted section 10(c) to include all reasonable remedies consistent with the Act's purposes. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 188-94, 61 S.Ct. 845, 849-52, 85 L.Ed. 1271 (1941) (Congress left to the NLRB the "adaption of means to end" because Congress was unable "to define the whole gamut of remedies to effectuate [the] policies [of the Act]...."). The final version of section 10(c), authorizing "such affirmative actions ... as will effectuate the policies of [the NLRA]" replaced earlier provisions that had enumerated specific types of remedies available to the Board.[4] The broader language was intended to "delegate to the Board the primary responsibility for making remedial decisions that best effectuate the policies of the [NLRA]." ABF Freight System, Inc. v. NLRB, 510 U.S. 317, 323-24, 114 S.Ct. 835, 839, 127 L.Ed.2d 152 (1994). See Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 900-01, 104 S.Ct. 2803, 2813-14, 81 L.Ed.2d 732 (1984); Golden State Bottling Co., Inc. v. NLRB, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); NLRB v. Strong, 393 U.S. 357, 359, 89 S.Ct. 541, 543-44, 21 L.Ed.2d 546 (1969); NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 346, 73 S.Ct. 287, 288-89, 97 L.Ed. 377 (1953). The Board's choice of remedy "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). And, "[the court is] obliged to defer heavily to the Board's remedial decisions." Local 32B-32J, Service Employees Int'l Union, AFL-CIO v. NLRB, 68 F.3d 490, 496 (D.C.Cir.1995) (citing NLRB v. Gissel Packing Co., 395 U.S. 575, 610-15, 89 S.Ct. 1918, 1938-41, 23 L.Ed.2d 547 (1969); Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 214-17, 85 S.Ct. 398, 404-06, 13 L.Ed.2d 233 (1964); Teamsters Local 115 v. NLRB, 640 F.2d 392 (D.C.Cir.1981)); Phelps Dodge, 313 U.S. at 188, 61 S.Ct. at 849-50 (attainment of the national policies manifested in the NLRA requires "expert administration in collaboration with limited judicial review ... [that is not] confined within narrow canons for equitable relief deemed suitable by chancellors in ordinary private controversies.").
 
 
 59
 There can be scant doubt that awarding attorney's fees to a charging party who has been subjected to surface bargaining and bad faith, frivolous litigation effectuates the policies of the NLRA by directly remedying the economic injury incurred by the party. In this regard, reimbursement for expenses of litigation is no different from compensation for the costs of bad faith negotiation, which the majority approves in this very case.[5] Using baseless, sham litigation to retaliate against or interfere in an employee's exercise of protected rights under the NLRA has been condemned by the Supreme Court as a violation of the NLRA and the Court has approved the Board's using its section 10(c) authority to order "the employer to reimburse the employees whom he had wrongfully sued for their attorney's fees and other expenses ... [and] order any other proper relief that would effectuate the policies of the [NLRA]." Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 747, 103 S.Ct. 2161, 2172, 76 L.Ed.2d 277 (1983). The Court further noted in Bill Johnson's that the Board needed such power despite the availability of state-court malicious prosecution remedies because the Federal Government has its own strong interest in enforcing the federal labor laws. Id. at 747 n. 14, 103 S.Ct. at 2172 n. 14. As the Seventh Circuit recently recognized in a case enforcing the Board's grant of attorney's fees for a frivolous state court suit:
 
 
 60
 Whether a union is subject to frivolous litigation as a part of the underlying unfair labor practice or during the adjudication of another unfair labor practice allegation, there can be a similar impact on the rights of the workers under the Act.
 
 
 61
 * * * * * *
 
 
 62
 A baseless and retaliatory lawsuit against a union can be a powerful weapon in the hands of an unprincipled employer. Such an employer need not win its lawsuit against a union to thwart the Union's attempts to organize workers; rather, the employer need only impose substantial costs and delays upon the Union.
 
 
 63
 Geske & Sons, Inc. v. NLRB, 103 F.3d 1366, 1378-79 (7th Cir.1997). The tactic is the same whether the litigant is before the Board or in court; only the forum differs.[6] It would be an anomalous result indeed if bad faith negotiation can be remedied by a grant of attorney's fees, and bad faith court proceedings as well, but bad faith Board proceedings merit no comparable remedy.
 
 
 64
 Fee-shifting power has been exercised by the Board only in cases that fall within the confines of the bad faith exception to the American Rule. In the few cases in which the Board has exercised it, the offending parties have acted outrageously in flaunting the Act's directives and abusing the Board's processes. See, e.g., Texas Super Foods, 303 N.L.R.B. 209 (1991); Autoprod, Inc., 265 N.L.R.B. No. 42 (1982); Wellman Industries, Inc., 248 N.L.R.B. 325; Koval Press, Inc., 241 N.L.R.B. 1261. Paradoxically, the majority uses the Board's reimbursement of expenses for its own proceedings to argue that it has exercised its power for punitive rather than remedial reasons, a power not included within its authority to effectuate the policies of the NLRA. See Republic Steel Corp. v. NLRB, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940). This sounds like doublespeak to me. When Congress determined that an aggrieved party must present unfair labor practices to the NLRB rather than to a court, surely it did not intend for the NLRB to become a dupe, exploitable at will by employers to intensify the harm stemming from their original violation of the labor laws. Inherent in any agency's authority to carry out its designated functions is the power to ensure the fairness, efficiency and integrity of its processes and the appropriateness of the conduct of the parties appearing before it. See Checkosky v. SEC, 23 F.3d 452, 455 (D.C.Cir.1994) (Silberman, J., concurring); Touche Ross & Co. v. SEC, 609 F.2d 570 (2d Cir.1979). Moreover, decisions of the NLRB are reviewed and enforced by the courts and conduct that dishonors and undermines the Board's processes dishonors and undermines the review process as well. Cf. ABF Freight System, Inc. v. NLRB, 510 U.S. at 326, 114 S.Ct. at 841 (Scalia, J., concurring). An agency's power to protect the integrity of its processes has not been held to be limited to the sanctions specifically provided by the statute that defines the agency's power to remedy violations of law. See, e.g., NLRB v. C.H. Sprague & Son Co., 428 F.2d 938 (1st Cir.1970); NLRB v. American Art Indus., Inc., 415 F.2d 1223 (5th Cir.1969); Uniroyal v. Marshall, 482 F.Supp. 364 (D.D.C.1979); see also Checkosky, 23 F.3d at 455-56 (agencies have inherent power to discipline officials appearing before the agency because it protects the administrative process and thus is reasonably related to the purposes of the laws that the agency is entrusted to enforce) (Silberman, J., concurring); Touche Ross & Co., 609 F.2d at 582 (agency disciplinary rules authorized despite the absence of express statutory authority in order to protect the integrity of agency's own processes); Gonzalez v. Freeman, 334 F.2d 570, 576-77 (D.C.Cir.1964) (Commodity Credit Corporation may debar irresponsible, defaulting or dishonest contractor despite the absence of explicit congressional authorization because such action is a necessary means for accomplishing congressional purpose of developing foreign markets for agricultural commodities). The imposition of attorney's fees on a party who grossly abuses the Board's processes is a defensive measure, equally justifiable as these other examples when invoked to protect the agency's integrity and to deter future abuses and distortion of its resources from more worthy cases.
 
 
 65
 In sum, I can find no convincing reason why the Board should not be allowed to construe its remedial mandate in section 10(c) so as to include an award of attorney's fees in a proceeding where a party has presented a frivolous defense to a serious unfair labor practice charge and in so doing has depleted the union's treasury, time and effectiveness, and misused the Board's process. We affirmed the Board's authority to do just that 24 years ago and I can find nothing in intervening Supreme Court cases that conflicts with such an interpretation by the Board of its authority. I respectfully dissent from that portion of the majority opinion holding to the contrary.
 
 
 
 *
 In its opinion the Board states that the award of litigation costs is "consistent not only with the American Rule, but alternatively with the bad-faith exception to that rule." 318 N.L.R.B. at 864. Although our dissenting colleague reads this statement as indicating that the Board was relying in the alternative upon its inherent power to control its own proceedings, in its brief the Board relies upon § 10(c) alone for authority to make Unbelievable pay the Unions' attorney's fees. When questioned at oral argument, counsel for the Board explained that the Board's opinion referred to the bad-faith exception to the American Rule not in order to posit an alternative rationale should it lack the power under § 10(c) to assess attorney's fees but only in order to point out that the Board's approach is consistent with the practice of the federal courts. Accordingly, we have no occasion in this case to address whether the Board might have such inherent power notwithstanding its lack of punitive authority (on which, see pp. 805-806)
 
 
 **
 The Supreme Court reversed Food Store Employees on a different ground, 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974), expressly declining to "address the question whether the Board's broad powers under § 10(c) ... to fashion remedies include power to order reimbursement of litigation expenses and excess organizational costs." Id. at 8 n. 9, 94 S.Ct. at 2079 n. 9. While Food Store Employees was pending before the Supreme Court, however, this court had upheld the Board in Tiidee Products, Inc., 194 NLRB 1234, sub nom. Electrical Workers v. NLRB, 502 F.2d 349 (1974). The panel in the latter case considered itself bound by the earlier panel's decision in Food Store Employees. Accordingly, although Tiidee is the surviving precedent in this circuit, the reasoning upon which it rests appears only in Food Store Employees
 
 
 **
 * The intervenor, but not the Board, draws our attention to Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), but it misconstrues that case: "after Summit [Valley] Industries," it says, "the Supreme Court specifically recognized that the Board's authority under § 10(c) includes the authority to order an employer held to have committed an unfair labor practice to pay 'the employees['] ... attorneys' fees and other expenses.' " Intervenor's Brief at 8, quoting Bill Johnson's, 461 U.S. at 747, 103 S.Ct. at 2172. In Bill Johnson's, however, the Supreme Court held only that if a respondent before the Board files a baseless lawsuit against the charging party in retaliation for the latter's exercise of its rights under the NLRA, then the prosecution of that lawsuit is itself an unfair labor practice, remediable by an order that the respondent cease and desist and pay the costs of defending against the baseless lawsuit--not the costs of participating in the unfair labor practice proceeding itself. Accordingly, Bill Johnson's is not relevant to our decision today
 
 
 [1]
 The Board indicated that litigation costs and expenses include: reasonable counsel fees, salaries, witness fees, transcript and record costs, printing costs, travel expenses and per diem, and other reasonable costs and expenses
 
 
 [2]
 The majority's observation that, subsequent to Alyeska, Congress enacted a number of fee-shifting provisions in civil rights statutes, Majority opinion ("Maj. op.") at 802-803, proves only that Congress wished to actively encourage private attorneys general to enforce those statutes. See S.REP. NO. 94-1011, 94th Cong., 2d Sess. 1, 2, 6 (1976), reprinted in 1976 U.S.C.C.A.N. 5909, 5910, 5913. No one has suggested that Congress thought Alyeska had eliminated or affected in any way traditional exceptions to the American Rule
 To bolster its contention that attorney's fees may never be awarded under the NLRA in the absence of express statutory authorization, the majority cites several cases in which the Supreme Court found no authorization for fee-shifting. Each one states only the obvious: the American Rule restricts fee-shifting unless there is express statutory authority or an exception applies. As in Alyeska, the Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), Court reasoned that, "but for a few well-recognized exceptions not present in these cases," there must be explicit authorization for the recovery of attorney's fees as a cost of litigation. Runyon, 427 U.S. at 185, 96 S.Ct. at 2602. In F.D. Rich Co. v. Industrial Lumber Co., 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), see Maj. op. at 802-803, the lower court construed the Miller Act to permit an attorney's fees award when the "public policy" of the state in which the lawsuit was brought "allows for the award of fees in similar contexts." Id. at 126, 94 S.Ct. at 2163. The Supreme Court reversed on the ground that there was no evidence of congressional intent to incorporate state law into Miller Act litigation and permitting such incorporation would upset the reasonable expectations of litigants and lead to disparate remedies for different litigants. Finally, the Court explained that although the Miller Act term "sums justly due" does not encompass attorney's fees, the American Rule permits "several exceptions to the general principle that each party should bear the costs of its own legal representation." Id. at 129, 94 S.Ct. at 2165. Thus, I disagree with the majority's suggestion that cases such as Runyon and F.D. Rich rule out fee-shifting by the Board under the NLRA in the case of bad faith defenses by charged companies. See Maj. op. at 801-803.
 
 
 [3]
 The majority insists that we cannot consider the relevance of the bad faith exception to the American Rule because counsel for the Board at oral argument stated that the Board relied solely on section 10(c) of the NLRA. Whatever the scope or intent of Board counsel's admission, the post hoc rationalization rule works to prevent counsel from adding to or subtracting from an agency's stated rationale. Ashland Oil, Inc. v. FTC, 548 F.2d 977 (D.C.Cir.1976). The Board's opinion clearly states that it "find[s] ample support for [its] conclusion that [its] Order is fully consistent not only with the American Rule, but alternatively with the bad faith exception to that rule."
 Ironically, the majority and I may have no real dispute over the Board's ultimate authority to render its ruling in this case. The majority says that it does not rule out the possibility that the Board has the authority to sanction a party that has acted in bad faith. Maj. op. at 800 n*. The Board, however, has only asserted its authority to assess fees in a frivolous defense case and has never attempted to broaden its authority beyond such circumstances. Thus, the majority's reversal means that, although the Board may well be justified in assessing attorney's fees in this case and, although it specifically cited the bad faith exception to the American Rule as consistent with its ruling, because it relied on its broad authority under section 10(c) to effectuate the purposes of the NLRA as the main support for its action, its action must be nullified. This makes no sense to me.
 
 
 [4]
 The majority's suggestion that the substitution of "reinstatement of employees, with or without back pay" as an example of an affirmative action in the final bill for the term "restitution," which had appeared in earlier versions, evinced an intent to narrow the discretion of the Board in remedial matters, Maj. op. at 804-805, is wrong. Both "reinstatement" and "restitution" were used only as illustrations of "affirmative actions," in no way intended to confine Board power. Actually, restitution restores to a party property or money of which the party has been deprived, see BALLENTINE'S LAW DICTIONARY 1107 (3d ed.1969), and is thus a backward-looking remedy. Reinstatement with back pay returns a person to a formerly held position and is thus both backward and forward looking. So, if it signifies anything, the substitution of "reinstatement" signified a broadening of section 10(c) power in the illustration
 
 
 [5]
 The majority contends that an award of litigation expenses as a remedy for bad faith conduct is not closely related to the Board's area of expertise or its statutory mission, but where the award of attorney's fees is targeted at a respondent's attempt to misuse the Board's processes in order to thwart a charging party's ability to bargain, the Board's expertise is very relevant. The impact that bad faith conduct has on a charging party is directly in the domain of the Board, which deals daily with the dynamics of employer-union relationships
 
 
 [6]
 Although a charging party is not legally required to litigate its case before the Board, the Board's rules and regulations assume that the charging party is a fully participating party in the litigation. Enforcement of the NLRA relies solely on the initiation of charges by the charging party. NLRB v. Food and Comm'l Workers Union, 484 U.S. at 118, 108 S.Ct. at 418. The term "party" as used in the Board's regulations includes "without limitation, any person filing a charge or petition under the [NLRA]...." 29 C.F.R. § 102.8. Thus, a charging party need not take any action in order to participate fully in Board proceedings. "Any person desiring to intervene in any proceeding," on the other hand, must explicitly move for permission to intervene. Id. § 102.29
 The charging party plays an integral role in the entire NLRA proceedings. The initial obligation to identify and serve an unfair labor practice charge falls upon the charging party. Id. § 102.14. In addition, "[i]f, after the charge has been filed, the regional director [of the NLRB] declines to issue a complaint ... [or withdraws a complaint, the charging party] may obtain a review of such action by filing an appeal with the general counsel." Id. § 102.19. If the Regional Director of the NLRB and the respondent agree to a settlement, the charging party has a right to object to the regional director, the General Counsel and in certain cases the Board. Id. § 101.9.
 Once formal proceedings have begun, a charging party is treated just like any other party. It may take depositions in connection with Board proceedings, id. § 102.30, and may subpoena witnesses and documents, id. § 102.31, just like the General Counsel and the respondent. Charging parties have the right to appear at the hearing and to examine and cross examine witnesses. Id. § 102.38. It may file briefs and files exceptions to the administrative law judge's findings. Id. §§ 102.42, 102.46.
 These rules demonstrate that a charging party is expected to be a principal participant in the litigation of the charged unfair labor practice. The prosecution of an unfair labor practice is designed primarily to remedy the victim. Victims of unfair labor practices have no other remedy but to invoke the Board's authority. They cannot turn initially to civil courts. They must rely on and actually assist the Board's counsel in making their case.