# ABF FREIGHT SYSTEM, INC. *v.* NATIONAL LABOR RELATIONS BOARD

No. 92–1550. Argued December 1, 1993—Decided January 24, 1994

318

Stevens, J., delivered the opinion of the Court, in which Rehnquist, C. J., and Blackmun, Kennedy, Souter, Thomas, and Ginsburg, JJ., joined. Kennedy, J., filed a concurring opinion, *post*, p. 325. Scalia, J., filed an opinion concurring in the judgment, in which O'Connor, J., joined, *post*, p. 326.

*John V. Jansonius* argued the cause for petitioner. With him on the briefs were *Jill J. Weinberg* and *Alan Wright.*

*Deputy Solicitor General Wallace* argued the cause for respondent. With him on the brief were *Solicitor General Days, Michael R. Dreeben, Jerry M. Hunter, Nicholas E. Karatinos, Norton J. Come, Linda Sher,* and *John Emad Arbab.**

Justice Stevens delivered the opinion of the Court.

Michael Manso gave his employer a false excuse for being late to work and repeated that falsehood while testifying under oath before an Administrative Law Judge (ALJ). Notwithstanding Manso's dishonesty, the National Labor Relations Board (Board) ordered Manso's former employer to reinstate him with backpay. Our interest in preserving the integrity of administrative proceedings prompted us to grant

---

**James D. Holzhauer, Timothy S. Bishop,* and *Daniel R. Barney* filed a brief for the American Trucking Associations as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations by *Marsha S. Berzon* and *Laurence Gold;* for the Lawyers' Committee for Civil Rights Under Law et al. by *Herbert M. Wachtell, William H. Brown III, Norman Redlich, Thomas J. Henderson, Richard T. Seymour, Sharon R. Vinick, Mitchell Rogovin, Randal S. Milch, Robert C. Bell, Jr.,* and *Donna R. Lenhoff.*

*E. Carl Uehlein, Jr., Joseph E. Santucci, Jr., Stephen A. Bokat, Robin S. Conrad,* and *Mona C. Zeiberg* filed a brief for the Chamber of Commerce of the United States et al. as *amici curiae.*

certiorari to consider whether Manso's misconduct should have precluded the Board from granting him that relief.

## I

Manso worked as a casual dockworker at petitioner ABF Freight System, Inc.'s (ABF's) trucking terminal in Albuquerque, New Mexico, from the summer of 1987 to August 1989. He was fired three times. The first time, Manso was 1 of 12 employees discharged in June 1988 in a dispute over a contractual provision relating to so-called "preferential casual" dockworkers.[1] The grievance Manso's union filed eventually secured his reinstatement; Manso also filed an unfair labor practice charge against ABF over the incident.

Manso's return to work was short lived. Three supervisors warned him of likely retaliation from top management—alerting him, for example, that ABF was "gunning" for him, App. 96, and that "the higher echelon was after [him]," *id.*, at 96–97. See also *ABF Freight System, Inc.,* 304 N. L. R. B. 585, 592, 597 (1991). Within six weeks ABF discharged Manso for a second time on pretextual grounds—ostensibly for failing to respond to a call to work made under a stringent verification procedure ABF had recently imposed upon preferential casuals.[2] Once again, a grievance panel ordered Manso reinstated.

---

[1] ABF at this time had three dockworker classifications: those on the regular seniority list, nonpreferential casuals, and preferential casuals. *ABF Freight System, Inc.,* 304 N. L. R. B. 585, 589, n. 10 (1991). A supplemental labor agreement ABF negotiated with the union in April 1988 created the preferential casual dockworker classification with certain seniority rights. *Id.,* at 585–586.

[2] The policy required preferential casuals—though not other dockworkers—to be available by phone prior to a shift in case a foreman needed them to work. A worker who did not respond risked disciplinary action for failing to "protect his shift"; two such failures authorized ABF to discharge the worker. *Id.,* at 597. ABF issued a written warning to Manso on May 6, 1989, after he failed to respond to such a call. On June 19, a supervisor again asked a regular dockworker to summon Manso to work just prior to 6 a.m. for the 8:30 a.m. shift. When Manso did not

Manso's third discharge came less than two months later. On August 11, 1989, Manso arrived four minutes late for the 5 a.m. shift. At the time, ABF had no policy regarding lateness. After Manso was late to work, however, ABF decided to discharge preferential casuals—though not other employees—who were late twice without good cause. Six days later Manso triggered the policy's first application when he arrived at work nearly an hour late for the same shift. Manso telephoned at 5:25 a.m. to explain that he was having car trouble on the highway, and repeated that excuse when he arrived. ABF conducted a prompt investigation, ascertained that he was lying,[3] and fired him for tardiness under its new policy on lateness.

Manso filed a second unfair labor practice charge. In the hearing before the ALJ, Manso repeated his story about the car trouble that preceded his third discharge. The ALJ credited most of his testimony about events surrounding his dismissals, but expressly concluded that Manso lied when he told ABF that car trouble made him late to work. *Id.*, at 600. Accordingly, although the ALJ decided that ABF had illegally discharged Manso the second time because he was a

---

answer, the employee who had dialed his number asked to dial it again, fearing he had misdialed. The supervisor denied permission and instead had the employee sign a form verifying that Manso had not responded. Manso was then discharged. The ALJ found that the special call policy discriminated against preferential casual dockworkers as a class, *id.*, at 598, 600; both the ALJ and the Board concluded that it was discriminatorily applied to Manso, *id.*, at 600, 589, n. 11.

[3] Manso told ABF management that his car had overheated on the highway, that he had to phone his wife to pick him up and take him to work. Manso also said a deputy sheriff stopped him for speeding in his ensuing rush. A plant manager who looked for Manso's overheated car on the highway found nothing, however, and the officer who Manso said issued him a warning for speeding told ABF officials—and later the ALJ—that Manso had been alone in the car.

party to the earlier union grievance,[4] the ALJ denied Manso relief for the third discharge based on his finding that ABF had dismissed Manso for cause. *Ibid.*

The Board affirmed the ALJ's finding that Manso's second discharge was unlawful, but reversed with respect to the third discharge. *Id.,* at 591. Acknowledging that Manso lied to his employer and that ABF presumably could have discharged him for that dishonesty, *id.,* at 590, n. 13, the Board nevertheless emphasized that ABF did not in fact discharge him for lying and that the ALJ's conclusion to the contrary was "a plainly erroneous factual statement of [ABF]'s asserted reasons."[5] Instead, Manso's lie "established only that he did not have a legitimate excuse for the August 17 lateness." *Id.,* at 589. The Board focused primarily on ABF's retroactive application of its lateness policy to include Manso's first time late to work, holding that ABF had "seized upon" Manso's tardiness "as a pretext to discharge him again and for the same unlawful reasons it discharged him on June 19."[6] In addition, though the Board deemed Manso's discharge unlawful even assuming the validity of ABF's general disciplinary treatment of preferential casuals, it observed that ABF's disciplinary approach and lack of uniform rules for all dockworkers "raise[d] more questions than they resolve[d]." *Id.,* at 590. The Board ordered ABF to reinstate Manso with backpay. *Id.,* at 591.

---

[4] Specifically, the ALJ held that the dismissal violated §§ 8(a)(1), (3), and (4) of the National Labor Relations Act, 49 Stat. 452, as amended, 29 U. S. C. §§ 158(a)(1), (3), and (4).

[5] 304 N. L. R. B., at 590. The Board found that the record in this case unequivocally established that ABF did not treat Manso's dishonesty "in and of itself as an independent basis for discharge or any other disciplinary action." *Ibid.*

[6] *Id.,* at 591. The Board also noted that the supervisors' threats of retaliation and the earlier unlawful discharge under the verification policy provided "strong evidence" of unlawful motivation regarding Manso's third discharge. *Id.,* at 590.

The Court of Appeals enforced the Board's order. *Miera v. NLRB*, 982 F. 2d 441 (CA10 1992). Its review of the record revealed "abundant evidence of antiunion animus in ABF's conduct towards Manso," *id.*, at 446, including "ample evidence" that Manso's third discharge was not for cause, *ibid.* The court regarded as important the testimony in the record confirming that Manso would not have been discharged under ABF's new tardiness policy had he provided a legitimate excuse. *Ibid.* The court also rejected ABF's argument that awarding reinstatement and backpay to an employee who lied to his employer and to the ALJ violated public policy.[7] Noting that "Manso's original misrepresentation was made to his employer in an attempt to avoid being fired under a policy the application of which the Board found to be the result of antiunion animus," the court reasoned that the Board had wide discretion to ascertain what remedy best furthered the policies of the National Labor Relations Act (Act). *Id.*, at 447.

## II

The question we granted certiorari to review is a narrow one.[8] We assume that the Board correctly found that ABF discharged Manso unlawfully in August 1989. We also assume, more importantly, that the Board did not abuse its discretion in ordering reinstatement even though Manso

---

[7] ABF's public policy argument relies on several decisions refusing to enforce reinstatement orders where the employee had engaged in serious misconduct. See, *e. g.*, *Precision Window Mfg.* v. *NLRB*, 963 F. 2d 1105, 1110 (CA8 1992) (employee lied about extent of union activities and threatened to kill supervisor); *NLRB* v. *Magnusen*, 523 F. 2d 643, 646 (CA9 1975) (employee padded time card and lied about it under oath); *NLRB* v. *Commonwealth Foods, Inc.*, 506 F. 2d 1065, 1068 (CA4 1974) (employees engaged in theft from employer); *NLRB* v. *Breitling*, 378 F. 2d 663, 664 (CA10 1967) (employee confessed to stealing from employer).

[8] We limited our grant of certiorari to the third question in the petition: "Does an employee forfeit the remedy of reinstatement with backpay after the Administrative Law Judge finds that he purposefully testified falsely during the administrative hearing?" Pet. for Cert. i.

gave ABF a false reason for being late to work. We are concerned only with the ramifications of Manso's false testimony under oath in a formal proceeding before the ALJ. We recognize that the Board might have decided that such misconduct disqualified Manso from profiting from the proceeding, or it might even have adopted a flat rule precluding reinstatement when a former employee so testifies. As the case comes to us, however, the issue is not whether the Board *might* adopt such a rule, but whether it *must* do so.

False testimony in a formal proceeding is intolerable. We must neither reward nor condone such a "flagrant affront" to the truth-seeking function of adversary proceedings. See *United States* v. *Mandujano,* 425 U. S. 564, 576–577 (1976). See also *United States* v. *Knox,* 396 U. S. 77 (1969); *Bryson* v. *United States,* 396 U. S. 64 (1969); *Dennis* v. *United States,* 384 U. S. 855 (1966); *Kay* v. *United States,* 303 U. S. 1 (1938); *United States* v. *Kapp,* 302 U. S. 214 (1937); *Glickstein* v. *United States,* 222 U. S. 139, 141–142 (1911). If knowingly exploited by a criminal prosecutor, such wrongdoing is so "inconsistent with the rudimentary demands of justice" that it can vitiate a judgment even after it has become final. *Mooney* v. *Holohan,* 294 U. S. 103, 112 (1935). In any proceeding, whether judicial or administrative, deliberate falsehoods "well may affect the dearest concerns of the parties before a tribunal," *United States* v. *Norris,* 300 U. S. 564, 574 (1937), and may put the factfinder and parties "to the disadvantage, hindrance, and delay of ultimately extracting the truth by cross examination, by extraneous investigation or other collateral means." *Ibid.* Perjury should be severely sanctioned in appropriate cases.

ABF submits that the false testimony of a former employee who was the victim of an unfair labor practice should always preclude him from winning reinstatement with backpay. That contention, though not inconsistent with our appraisal of his misconduct, raises countervailing concerns. Most important is Congress' decision to delegate to the

Board the primary responsibility for making remedial decisions that best effectuate the policies of the Act when it has substantiated an unfair labor practice. The Act expressly authorizes the Board "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act]." 29 U. S. C. § 160(c). Only in cases of discharge for cause does the statute restrict the Board's authority to order reinstatement.[9] This is not such a case.

When Congress expressly delegates to an administrative agency the authority to make specific policy determinations, courts must give the agency's decision controlling weight unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 844 (1984). Because this case involves that kind of express delegation, the Board's views merit the greatest deference. This has been our consistent appraisal of the Board's remedial authority throughout its long history of administering the Act.[10] As we explained over a half century ago:

> "Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." *Phelps Dodge Corp.* v. *NLRB*, 313 U. S. 177, 194 (1941).

---

[9] "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." 29 U. S. C. § 160(c).

[10] See *Virginia Elec. & Power Co.* v. *NLRB*, 319 U. S. 533, 539–540 (1943). We stated in *Virginia Electric* that such administrative determinations should stand "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Id.*, at 540.

Notwithstanding our concern about the seriousness of Manso's ill-advised decision to repeat under oath his false excuse for tardiness, we cannot say that the Board's remedial order in this case was an abuse of its broad discretion or that it was obligated to adopt a rigid rule that would foreclose relief in all comparable cases. Nor can we fault the Board's conclusions that Manso's reason for being late to work was ultimately irrelevant to whether antiunion animus actually motivated his discharge and that ordering effective relief in a case of this character promotes a vital public interest.

Notably, the ALJ refused to credit the testimony of several ABF witnesses, see, e. g., 304 N. L. R. B., at 598, and the Board affirmed those credibility findings, id., at 585. The unfairness of sanctioning Manso while indirectly rewarding those witnesses' lack of candor is obvious. Moreover, the rule ABF advocates might force the Board to divert its attention from its primary mission and devote unnecessary time and energy to resolving collateral disputes about credibility. Its decision to rely on "other civil and criminal remedies" for false testimony, cf. *St. Mary's Honor Center* v. *Hicks*, 509 U. S. 502, 521 (1993), rather than a categorical exception to the familiar remedy of reinstatement is well within its broad discretion.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE KENNEDY, concurring.

I join the opinion of the Court and agree as well with the concerns expressed by JUSTICE SCALIA. Our law must not become so caught up in procedural niceties that it fails to sort out simple instances of right from wrong and give some redress for the latter. At the very least, when we proceed on the assumption that perjury was committed, the Government ought not to suggest, as it seemed to do here, that one who violates his testimonial oath is no worse than the stu-

dent who claims the dog ate his homework. See Tr. of Oral Arg. 42.

The Board's opinions show that it can become quite exercised about trial-related misconduct that obstructs its own processes. See *Lear-Siegler Management Service Corp.*, 306 N. L. R. B. 393, 394 (1992) (tolling the backpay award of an employee who threatened a witness, because such manipulation undermined "[t]he integrity of the Board's judicial process"). The Board seems more blithe, however, about the potential for dishonesty to disrupt the workplace. See *Owens Illinois, Inc.*, 290 N. L. R. B. 1193 (1988) (reinstating and awarding backpay to an employee who lied under oath, because the employer "failed to meet its burden of establishing that [the employee] is unfit for further employment"). True, the gravest consequence of lying under oath is the affront to the law itself. But both employer and employee have reason to insist upon honesty in the resolution of disputes within the workplace itself. And this interest, too, is not beyond the Board's discretion to take into account in fashioning appropriate relief.

JUSTICE SCALIA, with whom JUSTICE O'CONNOR joins, concurring in the judgment.

It is ordinarily no proper concern of the judge how the Executive chooses to exercise discretion, so long as it be within the scope of what the law allows. For that reason, judicial dicta criticizing unintelligent (but nonetheless lawful) executive action are almost always inappropriate. The context changes, however, when the exercise of discretion relates to the integrity of the unitary adjudicative process that begins in an administrative hearing before a federal administrative law judge and ends in a judgment of this or some other federal court. Agency action or inaction that undermines and dishonors that process undermines and dishonors the legal system—undermines and dishonors the courts. Judges may properly protest, no matter how lawful

(and hence unreversible) the agency action or inaction may be. Such a protest is called for in the present case, in which the Board has displayed—from its initial decision through its defense of that decision in this Court—an unseemly toleration of perjury in the course of adjudicative proceedings.

Michael Manso, the employee to whom the Board awarded backpay *and* reinstatement, testified in this case before Administrative Law Judge Walter H. Maloney the week of January 8, 1990. He was placed under oath—presumably standing up, his right hand raised, to respond to the form of oath set forth in the NLRB Judges' Manual § 17008 (1984):

> "Do you solemnly swear that the testimony which you will give in this proceeding will be the truth, the whole truth, and nothing but the truth, so help you God?"

He then proceeded to lie to the administrative tribunal, as he had earlier lied to his employer, concerning the reason he reported an hour late for work on August 17, 1989. He said that his car had broken down; that he called his wife, who came in her pajamas to pick him up; that he drove the rest of the way to work, with his wife, and was stopped for speeding along the way. The employer produced the officer that stopped him, who testified with assurance that Manso was all alone; that Manso mentioned no car trouble as an excuse for his speeding, but simply that he was late for work; and that the officer himself observed no car trouble. Hearsay evidence admitted (without objection) at the hearing showed that an ABF official, after Manso told his breakdown story on August 17, drove out to the portion of the highway where Manso said he had left the disabled vehicle, and found it not to be there. Administrative Law Judge Maloney found that "Manso was lying to the Respondent when he reported that his car had overheated and that he was late for work because of car trouble"—which meant, of course that he was also lying under oath when he repeated that story. *ABF Freight System, Inc.*, 304 N. L. R. B. 585, 600 (1991). The ALJ did

not punish the false testimony, but his finding that the dismissal on August 17 was for cause had something of that effect, depriving Manso of reinstatement.

The Board itself accepted the ALJ's finding that the car-breakdown story was a lie, but since it found that the *real* reason for the August 17 dismissal was neither Manso's lateness nor his dishonesty, but rather retaliation for his filing of an earlier unfair-labor-practice complaint, it ordered Manso's reinstatement. In stark contrast to today's opinion for the Court, the Board's opinion did not carefully weigh the pros and cons of using the Board's discretion in the conferral of relief to protect the integrity of its proceedings. It weighed those pros and cons *not at all.* Indeed, it *mentioned the apparent perjury not at all,* as though that is just part of the accepted background of Board proceedings, in no way worthy of note. That insouciance persisted even through the filing of the Board's brief in this Court, which makes the astounding statement that, in light of his "history of mistreatment," Manso's lying under oath, "though unjustifiable, is understandable." Brief for Respondent 22, n. 15. (In that context, of course, the plain meaning of "to understand" is "[t]o know and be tolerant or sympathetic toward." American Heritage Dictionary 1948 (3d ed. 1992).)

Well, I am not understanding of lying under oath, whatever the motivation for it, and I do not believe that any law enforcement agency of the United States ought to be. Title 18 U. S. C. § 1621 provides:

> "Whoever—
> 
> "... having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify . . . truly, . . . willfully and contrary to such oath states . . . any material matter which he does not believe to be true . . .

.        .        .        .        .

"is guilty of perjury and shall . . . be fined not more than $2,000 or imprisoned not more than five years, or both. . . ."

United States Attorneys doubtless cannot prosecute perjury indictments for all the lies told in the Nation's federal proceedings—not even, perhaps, for all the lies so cleanly nailed as was the one here. Not only, however, did the Board not refer the matter for prosecution, it did not impose, indeed did not even explicitly consider imposing, another sanction available to it (and not generally available to federal judges): denying discretionary relief because of the intentional subversion of the Board's processes.

While the Court is correct that we have no power to compel the Board to apply such a sanction, nor even, perhaps, to require that the Board's opinion explicitly consider it, neither was the Board's action in this case as eminently reasonable as the Court makes it out to be. Nor does it deserve the characterization of being *"well* within [the Board's] broad discretion," *ante,* at 325 (emphasis added). In my estimation, it is at the very precipice of the tolerable, particularly as concerns the Board's failure even to consider and discuss the desirability of limiting its discretionary relief.

Denying reinstatement would not, as the Court contends, involve the "unfairness of sanctioning Manso while indirectly rewarding [ABF] witnesses' lack of candor." *Ibid.* First of all, no "indirect reward" comes to ABF, which receives nothing from the Board. There is a world of difference between the mere inaction of failing to punish ABF for lying (which is the "indirect reward" that the Court fears) and the beneficence of conferring a nonmandated award upon Manso *despite* his lying (which is the much greater evil that the Court embraces). The principle that a perjurer should not be rewarded with a judgment—even a judgment otherwise deserved—where there is discretion to deny it, has a long and sensible tradition in the common law. The "unclean

hands" doctrine "closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co.* v. *Automotive Maintenance Machinery Co.*, 324 U. S. 806, 814 (1945) (denying relief because of perjury). See H. McClintock, Principles of Equity § 26, p. 63, and n. 75 (2d ed. 1948). And the Board itself has sometimes applied this sanction in the past. See, *e. g., D. V. Copying & Printing, Inc.*, 240 N. L. R. B. 1276 (1979); *O'Donnell's Sea Grill*, 55 N. L. R. B. 828 (1944). In any case, there is no realistic comparison between the ABF managers' disbelieved testimony concerning motivations for firing and Manso's crystal-clear lie that he was where he was not. The latter is the stuff of perjury prosecutions; the former is not.

The Court is correct that an absolute rule requiring the denial of discretionary relief for perjury "might force the Board to divert its attention from its primary mission and devote unnecessary time and energy to resolving collateral disputes about credibility." *Ante*, at 325. But intelligent and conscientious application of the Board's supposed rule *permitting* denial of discretionary relief for perjury would not have that effect—and such application should probably have occurred, and should surely have been considered, in an obvious case such as this. Nor am I as impressed as the Court is by the Board's assertion that "ordering effective relief in a case of this character promotes a vital public interest." *Ibid.* Assuredly it does, but *plenty* of effective relief was ordered here without adding Manso's reinstatement, including (1) the entry of a cease-and-desist order subjecting ABF to severe sanctions if it commits similar unfair labor practices in the future, (2) the award of backpay to Manso for the period from his unlawful discharge on June 19, 1989, to the date of his subsequent reinstatement, and (3) the posting of a notice on ABF's premises, reciting its commitments under the cease-and-desist order, and its commitment to give

Manso backpay. All of this would have made it clear enough to ABF and to ABF's employees that violating the National Labor Relations Act does not pay. Had the posted notice also included, instead of ABF's commitment to reinstate Manso (which is what the Board ordered), a statement to the effect that Manso's reinstatement *would* have been ordered but for his false testimony, then it *also* would have been made clear to ABF and to ABF's employees that perjury does not pay.

I would have felt no need to write separately if I thought that, as the Court puts it, the Board has simply decided "to rely on 'other civil and criminal remedies' for false testimony." *Ibid.* My impression, however, from the Board's opinion and from its presentation to this Court, is that it is really not very much concerned about false testimony. I concur in the judgment of the Court that the NLRB did nothing against the law, and regret that it missed an opportunity to do something for the law.