LAY, Circuit Judge,
dissenting.
The majority’s opinion represents a departure from basic principles of administrative law. By stating that the Surface Transportation Board cannot use Class I standards in this case, the majority overlooks the specialized expertise of the Board in assessing the reasonableness of the Arkansas Midland embargo. It is for the Board to determine what Federal Railroad Administration standards should govern an embargo proceeding. As the Board observed:
[Cjlass 1 standards are the FRA’s'mim-mum standards; they are the lowest standards to which the ICC and now the Board have looked in assessing rehabilitation costs in abandonment cases; and, notwithstanding the fact that a carrier may, in unusual circumstances, seek (at its own election) to operate under excepted standards, class 1 standards represent the minimum level of safety compliance at which a carrier can be required to operate.' They are therefore the appropriate level to be used in the typical embargo proceeding. (emphasis added).
GS Roofing Prod. Co. v. Arkansas Midland, R.R., No. 41230, 1997 WL 104290, at *6 (I.C.C. March 5, 1997).
The law is well-settled that an administrative body such as the Board is entitled to great deference in its construction of the statutes that it is charged with administrating. See, e.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (unless a law is clear and explicit, a court must limit its inquiry to determining whether an agency’s interpretation “is based on a permissible construction of the statute.”) When Congress expressly delegates to an administrative agency the authority to make specific policy determinations, courts must give the agency’s decision controlling weight unless it is arbitrary, capricious, or manifestly contrary to statute. See ABF Freight System, Inc. v. N.L.R.B., 510 U.S. 317, 324, 114 S.Ct. 835, 839-40, 127 L.Ed.2d 152 (1994). An administrative agency ruling is arbitrary or capricious only if the agency has failed entirely to consider important aspects of a problem. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1061, 117 L.Ed.2d 239 (1992); see also Motor Vehicle Manufacturers Ass’n v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (“[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider ... offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.”).
In the present case, the Board, as the reviewing agency, reached an entirely permissible interpretation of the statute governing Arkansas Midland’s common carrier obligation, 49 U.S.C. § 11101(a), and this determination hardly was reached in an arbitrary or capricious manner. The balancing test employed in this case previously has been used by the Board and its predecessor, the Interstate Commerce Commission, to determine the reasonableness of rail embargoes. See, e.g., Overbrook Farmers, 5 I.C.C.2d 316; Louisiana Railcar, 5 I.C.C.2d 542. The Board’s written decision thoroughly explains the basis for its findings, and touches on all of the' balancing test factors articulated in Overbrook Farmers and Louisiana Railcar. For this reason, the shippers’ claim that the Board erred in its decision amounts to little more than an impermissible call for this Court to reweigh previously evaluated evidence.
The majority, however, finds the Board erred as a matter of law in employing Class I standards to assess the cost of repairing the Norman Branch. The proper standard for assessing costs, the majority concludes, should focus on resuming service to pre-embargo levels. It reasons that, because the line was operated satisfactorily as excepted track prior to the embargo, restoring service to the excepted track level is the only cost assessment the Board may legitimately consider.
I believe the majority’s holding is erroneous for several reasons. First, there is noth *396 ing beyond the majority’s singular notions of right and wrong that mandates costs may only be evaluated in regard to restoration of pre-embargo service levels. In Louisiana Railcar, the ICC held that Class I standards were not necessary to return the line to service in the case before it because “[t]he line was satisfactorily operated at excepted levels prior to the embargo.” 5 I.C.C.2d at 546. By contrast, the Board found on the Norman Branch that “the operations — which involved very heavy shipments moving over very dangerous track — were marginal before the embargo, as reflected by the numerous derailments that occurred (and have continued to occur).” GS Roofing, 1997 WL 104290 at *6 n. 39.
By finding that Louisiana Railcar forecloses the Board from assessing costs under Class I standards, the majority ignores a key premise stated in its own analysis: “The reasonableness of an embargo involves a fact-specific inquiry and is to be determined on a case-by-case basis.” See supra, part III. In Louisiana Railcar, the ICC found that the railroad’s embargo was not reasonable, because the line had been satisfactorily operated at excepted levels, and $18,000 for restoration was “an amount that [the railroad], a large Class I carrier, could afford.” 5 I.C.C.2d at 546. As the Board’s inquiry revealed, that particular set of facts does not apply in this case, and therefore the reasonableness of the carrier’s actions cannot be justifiably assessed by the same rigid, uniform standard.
This is why, as the majority recognizes, each embargo must be assessed on a case-by-case basis, and why it is a mistake for the Court to dictate to the Board what standard it must employ. As long as the standard is not used in an arbitrary or capricious manner, the Board is acting within its administrative discretion.
Second, the majority erroneously concludes that “[t]he Board’s decision allows a carrier that operates at an excepted level to cease operations unilaterally simply because upgrading its line to Class I standards would be impractical or unaffordable.” See supra, part III. This statement overlooks the fact that costs of repair is only one of five factors the Board considered as part of a clearly articulated balancing test. Other factors— length of the embargo, the carrier’s intent, the amount of traffic on the line, and the financial condition of the carrier — were all considered by the Board to assess the reasonableness of Arkansas Midland’s embargo. In other words, the Board’s assessment of costs in this case would not allow any carrier to “cease operations unilaterally,” because it is always possible that costs of an upgrade may be outweighed by other factors that render the carrier’s actions unreasonable.
Finally, I believe the majority’s ruling loses sight of the basic question the Board was charged with answering: Were the actions of the carrier objectively unreasonable in light of the information available at the time of the embargo. I do not understand how this Court can find that the Board abused its discretion by concluding that it was reasonable for a small, cash-strapped carrier like Arkansas Midland to calculate the long-term costs of rehabilitation in making its embargo decision. The majority implies that the common-carrier obligation is breached unless a railroad employs all necessary means to restore limited service, regardless of the condition of the track, and regardless that such actions may equate to tossing money down a bottomless pit. Not only is such a result contrary to good economic sense; it is contrary to Supreme Court precedent that a carrier cannot be required to expend money it can never recover on an unsuccessful rail line. See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 325, 101 S.Ct. 1124, 1134, 67 L.Ed.2d 258 (1981) (“The duty to provide [rail service] is not absolute, and the law exacts only what is reasonable of the railroads under the existing circumstances.”) (internal quotations omitted); Purcell v. United States, 315 U.S. 381, 385, 62 S.Ct. 709, 711, 86 L.Ed. 910 (1942) (“When materials and labor are devoted to the [rebuilding of a line in an amount that cannot be justified in terms of the reasonably predictable revenues, there is ample ground to support a conclusion that the expenditures are wasteful whoever foots the bill.”).
The Supreme Court recently reiterated: “If the agency’s reading [of a statute] fills a *397 gap or defines a term in a reasonable way in light of the Legislature’s design, we give that reading controlling weight, even if it is not the answer ‘the court would have reached if the question initially had arisen in a judicial proceeding.’ ” Regions Hosp. v. Shalala, — U.S. -, 118 S.Ct. 909, 915, 139 L.Ed.2d 895 (1998) (quoting Chevron U.S.A., 467 U.S. at 843, n. 11, 104 S.Ct. at 2781, n. 11.) I respectfully submit that this well-established deference to administrative determinations is slighted by the majority ruling. Even if the Board’s answer is not the same the Court would have reached, substitution of the Board’s expertise is not an appropriate exercise of the Court’s appellate power.