UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MINGO LOGAN COAL COMPANY,
*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,
*Respondent,*

UNITED MINE WORKERS OF AMERICA,
*Respondent-Intervenor.*

No. 02-1205

MAHON ENTERPRISES, INCORPORATED,
*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,
*Respondent,*

UNITED MINE WORKERS OF AMERICA,
*Respondent-Intervenor.*

No. 02-1261

NATIONAL LABOR RELATIONS BOARD,
*Petitioner,*

UNITED MINE WORKERS OF AMERICA,
*Petitioner-Intervenor,*

v.

MINGO LOGAN COAL COMPANY;
MAHON ENTERPRISES, INCORPORATED,
*Respondents.*

No. 02-1360

On Petitions for Review and Cross-application
for Enforcement of an Order
of the National Labor Relations Board.
(9-CA-31797, 9-CA-31939)

Argued: April 3, 2003

Decided: June 17, 2003

Before WIDENER, NIEMEYER, and GREGORY, Circuit Judges.

_____

Affirmed in part and remanded in part by unpublished opinion. Judge Gregory wrote the opinion, in which Judge Widener joined. Judge Niemeyer wrote an opinion concurring in the judgment.

_____

## COUNSEL

**ARGUED:** Forrest Hansbury Roles, HEENAN, ALTHEN & ROLES, L.L.P., Charleston, West Virginia, Petitioners. Jill Ann Griffin, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondents. **ON BRIEF:** George J. Oliver, SMITH MOORE, L.L.P., Raleigh, North Carolina, for Petitioner Mahon. Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Havard, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent Board. Grant Crandall, Deborah Stern, Judith Rivlin, UNITED MINE WORKERS OF AMERICA, Fairfax, Virginia, for Respondent UMW.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

GREGORY, Circuit Judge:

This appeal follows from the National Labor Relations Board's (the "Board") affirmance of an Administrative Law Judge's ("ALJ") decision and recommended order finding that the appellants, Mingo Logan Coal Company ("Mingo") and Mahon Enterprises, Inc. ("Mahon") (collectively, the "Employers") were joint employers who had committed numerous violations of the National Labor Relations Act (the "Act") by, inter alia, threatening, intimidating, and ultimately firing 18 mine workers for their union organizing activity. The Employers challenge the sufficiency of the evidence underlying the ALJ's findings. Additionally, the Employers argue that the Board's remedial order, which requires the Employers to offer employment to the discharged laborers as well as backpay, constitutes an abuse of discretion. Because there is substantial evidence to support the ALJ's findings, the liability judgment should be affirmed. However, because the Board's remedial order unfairly deprives the Employers of the opportunity to litigate whether Mahon employees would have been hired by Mingo, we remand to the Board for further proceedings consistent with this decision.

I.

The decision of the ALJ, as adopted by the Board, contains an extensive discussion of the facts underlying this case. Because we affirm the Board's decision on liability, we shall limit our factual discussion herein largely to the ALJ's findings.

Mingo commenced operations in its Mountaineer Mine (the "Mine") in West Virginia in June 1991. The Mine is a high-production, longwall mine, which produces large quantities of metallurgical and seam coal. The development of the mine relies upon both continuous miner and logwall mining techniques. From the beginning of its operations, Mingo relied upon outsourced contract labor. The primary supplier of this labor was Mahon. Most of Mahon's employees were experienced miners, 80% of whom had experience working in unionized mines.

In the context of the mining activity, employees of both companies worked closely together. To better coordinate this joint activity, Mingo undertook measures to consolidate management of the two firms. Accordingly, Mingo employed a staff of foremen to oversee both inby and outby work. Among the supervisory staff retained by Mingo were several ex-Mahon foremen. The consolidation of operations often involved the placement of Mahon laborers directly under Mingo supervision. As such, the record contains numerous illustrations of the blurring of the lines separating the two companies. For example, Mingo Foreman James Allen, without consulting Mahon President Amon Mahon, asked Mahon employee Stewart Vint to take a job directly under his supervision. Though still a Mahon employee, Vint accepted this position with the added condition that all Mahon employees recognize Vint as having the capacity to speak for Allen. Other forms of Mingo control over Mahon laborers included the determination of tasks to be performed, staffing levels, wage rates, wage increases as well as the direct supervision of labor. Additionally, Mingo was involved in the discipline of Mahon employees.

The two Employers also enjoyed a referral relationship, wherein employment with Mahon was often represented as a stepping-stone to eventual employment with Mingo. As part of this relationship, Mingo exerted influence over Mahon employees who hoped eventually to gain employment with Mingo. For example, when Dennis Evans, an experienced miner with some unionized mine experience applied for a position with Mingo, he was referred to Mahon and told that the job would represent "a foot in the door to get a job with Mingo Logan." In another case, Mahon employee David Massey was asked by Mingo to become a crew leader, a position he originally declined. When told that taking the position would "be like putting your first step in the door" at Mingo, Massey agreed to take the position. Pleased with Massey's performance, as well as the fact that Mingo had not heard any rumors regarding his association with union organizing activity, Mingo directed Mahon to grant Massey a pay raise.

However, in cases where an employee was associated with union organization, his prospects with Mingo were substantially diminished. Evans, for example, at the behest of several Mingo supervisors who were pleased with his work, made repeated efforts to move to Mingo. Evans testified that a Mingo supervisor informed him that the real

reason why he was not hired by Mingo was his brother's union activity.

According to the Employers, these instances of joint control represented the rare exception rather than the rule. The Employers assert that Mahon exercised independent control over the vast majority of its 350 to 400 employees. Furthermore, the Employers maintain that cases involving supervision or decision-making regarding the essential terms of employment by Mingo over Mahon laborers were highly unusual. According to the Employers, Mingo exerted the degree of control over Mahon labor that would customarily characterize an outsourcing relationship. That is, Mahon made changes in response to Mingo's evolving needs. The Employers also maintain that Mingo was unaware of the union experience of the Mahon laborers that it was found to have turned away. Furthermore, the Employers maintain that Mingo hiring decisions were motivated only by their specific labor requirements.

The United Mine Workers of America (the "Union") began organizing activity at the Mine in January 1994.[1] About one month later, the Union held its first mass union meeting, at which time the campaign became open. Union organizers employed customary means in support of their campaign, including the distribution of literature and stickers. The Employers responded decisively to the news of the campaign. This response included interrogations of employees regarding their own involvement in union organization as well as the involvement of their peers. Mingo management also threatened to terminate employees suspected of involvement with the union campaign. The record also contains evidence that Mingo threatened, in the event the campaign were successful, to terminate its relationship with Mahon and close the Mine. Mahon employees who were seen demonstrating support for the Union, by for example wearing stickers on their helmets, were warned to remove the stickers or risk endangering their prospects of obtaining a position with Mingo. The Employers developed stickers of their own in opposition to the campaign, which they distributed to employees accompanied by the suggestion that they be displayed. The Employers went as far as to tell Massey, who rode to

---

[1]The Union was the charging party before the Board and intervened on the side of the Board in this action.

work with an open Union supporter, to terminate all association or risk losing his job.

In late March 1994, Mingo informed Mahon that there would be an upcoming layoff of Mahon employees due to a decrease in demand for laborers. Amon Mahon organized a meeting with his supervisors to discuss the issue. At this meeting, according to a statement attributed to Assistant Foreman Danny Colegrove, Mahon said that his firm would have to fire about 20 employees to "make them an example to everybody else." The ALJ found, over the Employers' denials that such an event ever occurred, that a few days before the layoff was announced, senior management of Mingo and Mahon met to determine which employees to lay off. On the day of the layoff, Amon Mahon informed the 18 employees who had been selected that he had no control over the decision. Among the 18 workers who were terminated, were some of the most senior and experienced laborers at the Mine. 17 of the 18 had signed union authorization cards.

Following the layoffs, the Union filed unfair labor practice charges. Upon completion of its own investigation, the Board's General Counsel filed a complaint alleging that Mingo and Mahon were joint employers, and that they had intimidated, threatened, and ultimately laid off 18 employees because of their union activity. After a 13-day hearing, the ALJ issued its decision and recommended an order finding that the Employers had committed violations of Section 8(a)(1) of the Act. 29 U.S.C. § 158(a)(1). The ALJ also found that the Employers were joint employers and had violated sections 8(a)(1) and (3) of the Act by discriminatorily laying off 18 employees. 29 U.S.C. § 158 (a)(1) and (3). The Board affirmed the ALJ's decision.[2] In addition to ordering the Employers to cease and desist from the unfair labor practices, the Board's decision requires, inter alia, that the Employers offer the laid-off employees their former positions and make them whole for lost wages.

---

[2]We limit our discussion of the procedural history to the relevant ALJ and Board determinations, omitting a discussion of proceedings related to the election.

## II.

The ALJ's factual findings are conclusive if supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 478 (1951). However, we may set aside a Board decision when we "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Id.* With respect to credibility determinations, which are an important part of the Employers' challenge on appeal, we uphold the ALJ's determinations absent "exceptional circumstances." *NLRB v. Air Products & Chemicals, Inc.*, 717 F.2d 141, 145 (4th Cir. 1983). Finally, we review remedial orders for abuse of discretion. *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 898-899 (1984) (The Act vests "in the Board the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review."). Accordingly, we give the ALJ's determination controlling weight unless the remedy is "arbitrary, capricious, or manifestly contrary to the statute." *ABF Freight System v. NLRB*, 510 U.S. 317, 324 (1994) (citation omitted).

## III.

### A. *THE SECTION 8(A)(3) VIOLATION*

This case turns upon the conflicting factual contentions of the parties with respect to whether the layoff was retaliatory. We shall review the Employers' principal arguments, and then assess them against the Board's counter-arguments in light of the appropriate standard of review. In each case, we find that there is substantial evidence to support the ALJ's adverse determination.[3] We shall proceed by

---

[3]The Board found that Mingo and Mahon violated Section 8(a)(1) when its supervisors engaged in an anti-union campaign and took measures including coercive interrogations and threats of retaliation. This issue is a bit unusual because the Employers do not properly contest the ALJ's findings in their brief. Rather than contesting these allegations, they include a footnote arguing that the findings are based upon faulty credibility determinations. Br. of Employers, at 25 n.7. They then indicate that they are unable to develop their position due to space con-

addressing the Employers' primary arguments surrounding the central factual questions: 1) whether the firing was motivated by anti-union animus; and 2) whether the Employers are joint employers. We shall then address the remedy separately.[4]

### 1.  *Animus*

The Employers argue that the ALJ's determination that Mingo maintained an anti-union hiring policy, which it found to evidence anti-union animus, is not supported by substantial evidence. The

---

straints. Finally, in their Reply Brief, the Employers argue that the existence of certain violations does not automatically constitute substantial evidence of other violations. Reply Br. at 7.

We review these arguments under the standard for challenges against the ALJ's credibility determinations. This issue is relevant because the findings of hostility and coercion may serve to buttress the ALJ's findings of animus in the context of the Section 8(a)(3) analysis. *See NLRB v. Frigid Storage, Inc.*, 934 F.2d 506, 510 (4th Cir. 1991)("[T]he Company cannot contest certain charges in a vacuum by not contesting others. The unchallenged violations remain in the case, lending their aroma to the context in which the issues are considered." (internal quotation and citation omitted)). We find that there is substantial evidence to support the Board's findings of violations of Section 8(a)(1). The Employers have not demonstrated that the credibility determinations between conflicting testimony upon which these findings rest are exceptionally strained or invalid. The record offers ample testimony regarding threats, intimidation and coercion. Although, there is no need to assume that the existence of the Section 8(a)(1) violation constitutes per se evidence of the 8(a)(3) violations, it may buttress the overall validity of the ALJ's findings. We shall look to this finding in our overall assessment of animus.

[4]One issue that does not fit into this overall scheme is the question of whether one of the discharged employees, David Massey, was a foreman, and therefore not entitled to protection under the Act. The ALJ found that Massey was not a foreman. His finding was supported by substantial evidence. Amon Mahon himself admitted that he never told Massey that he was a foreman, that he had no knowledge of anybody ever referring to him as such, and that there were no payroll records designating him as a foreman.

Board relied upon testimony of employees such as Evans, who as discussed above, learned from his Mingo supervisor that he would not be hired, despite strong support, because of his brother's organizing activity. The Employers respond that Mingo employee Jewell, who had explained the hiring decision to Evans, denied making this statement. Br. of Employers, at 4. The Employers also claim that there is no evidence that Mingo knew of the employees' union background, and therefore cannot have maintained an anti-union hiring policy.

Contrary to these objections, there is ample evidence upon which the ALJ could have found the existence of such a policy. The ALJ cited numerous instances in which employees were warned that they would not be able to obtain employment with Mingo if they displayed support for the union. Mahon employee Massey, who was told that his position with Mahon would be a foot in the door, and for whom Mingo had arranged a pay raise for his performance and apparent lack of union activity, was later discharged. Massey was seen wearing a pro-union sticker on his helmet. Massey was also told by Mingo Foreman Cook that Mingo would never hire Mahon workers who had signed a union card. Additionally, other Mahon employees testified that Cook had warned them to remove pro-union stickers from their helmets, or risk their prospects of employment with Mingo.

The record also contains substantial evidence to refute the Employers' contention that they were unaware of the union activity occurring at the Mine. For example, the Employers stipulated that they were aware by the time of the layoff that the campaign was under way. Additionally, the violations found under Section 8(a)(1) buttress the ALJ's finding of an animus inconsistent with objective hiring. The threats and interrogations found to have occurred cannot easily be reconciled with a neutral policy.

The Employers next argue that the ALJ abused his discretion by relying upon the testimony of Stewart Vint to establish that Amon Mahon based his termination decision upon union related grounds. Before the ALJ, Vint testified that he was informed by Colegrove, a senior Mahon employee, that Mahon would need to lay off pro-union employees as an example to the others. The Employers argue that this testimony should not have been credited because it was denied by both Colegrove and Mahon. The ALJ acknowledged the denials, but

made a specific credibility determination that Vint was credible. There is obvious reason to suspect the veracity of these denials. Accordingly, the ALJ made a credibility determination in the face of conflicting accounts.[5] The Employers have presented no exceptional circumstances that should cause us to reverse the ALJ's determination. Additionally, it is important to note that Colegrove's comments to Vint were found to be coercive in violation of Section 8(a)(1). Specifically, the ALJ found that Colegrove's interrogations regarding union activity combined with his comments regarding Mahon's plans constituted a threat to Mahon employees. In light of the stipulation and other strong evidence of awareness of the campaign, the Employers do not present a convincing argument for crediting Mahon's denial.

Finally, the Employers assert that there is no evidence to support the proposition that Mahon was even aware of his employees' involvement in the campaign. Appellant's Br. at 23-28. However, this argument is contradicted both by the Employers' stipulation of awareness and the credited evidence of witnesses regarding Mingo and Mahon's anti-union campaign in violation of Section 8(a)(1). The Employers argue that the awareness of the campaign among his supervisors cannot be imputed to Mahon. Br. of Appellant, at 26-28. However, where a subordinate has knowledge of such a campaign, which is highly relevant to his employer's labor relations, it is not unreasonable to infer that the knowledge has move upward.

---

[5]The Employers challenge the ALJ's admission of comments attributed to Colegrove as hearsay because Colegrove lacked agency to speak for his employer. However, the Employers designated Colegrove as a supervisor in their answers and failed to attempt to amend their answers until after the first week of trial, during which several harmful statements had been attributed to him. The ALJ did allow the Employers to introduce testimony and evidence regarding Colegrove's status. Based upon his review of this evidence, the ALJ concluded that Colegrove should be regarded as a supervisor. This conclusion is supported by the record testimony of employees who regarded Colegrove as a supervisor. Hence, even if the ALJ erred by refusing to permit the Employers to amend their answer, there is substantial evidence to support the designation of Colegrove as a supervisor.

Hence, even putting aside the testimony directly attributing animus to the Employers, in light of the ample evidence of the Employers' awareness of the campaign, the findings of section 8(a)(1) violations, and the Employers' stipulation, we find that there was a substantial basis for the ALJ's finding that the layoffs were illegally motivated by the Employers' desire to prevent union organization.

## 2. *Pretext*

In an attempt to justify the layoffs on non-discriminatory grounds, the Employers offer several arguments in support of the proposition that the layoffs were prompted by legitimate business needs.

### a. The Permit Denial

In January 1994, Mingo learned that it had not obtained an environmental permit necessary to advance certain aspects of its work. The Employers maintain that there was enough remaining work for the current Mahon laborers to keep them occupied until April 1994. At this time, according to the Employers, Mingo required fewer Mahon employees to continue its mining activity. Additionally, Mingo cites an analogous layoff that occurred in September 1992 due to a permit denial. Reply Br. of Employers, at 13. At that time, Mahon was also forced to lay-off a significant number of workers. The Employers argue that the ALJ's failure to address this prior incident constitutes reversible error.

There is substantial evidence to support the ALJ's finding that this explanation is pretextual. First, Mingo Superintendent Frye testified that there was no connection between the permit problem and Mingo's labor needs. Second, at the time of the layoff, the Employers were budgeting for an annual increase of work hours. This increase in hours also resulted in an increase in budgeted labor costs.

The Employers respond that although they may have been budgeting for increased hours and costs, they were still achieving cost savings by laying off the Mahon employees. Reply Br. of Employees, at 16-17. However, the ALJ was not bound to accept these explanations as truthful. Substantial evidence supports the ALJ's decision to reject

the counter-intuitive proposition that layoffs were necessary due to a lack of work while increased labor hours were being budgeted.

### b.   The Ten-Hour Shift

The Employers implemented a 10-hour shift for many of the workers around the time of the layoff. They argue that this increase in hours rendered unnecessary the Mahon laborers. The ALJ rejected this explanation as pretextual. The ALJ did not accept this explanation because of the history behind the schedule change. Mingo had reduced the shift of the relevant laborers to 9 hours back in October 1993. It claimed that the laborers complained and requested a return to a 10-hour work schedule. However, the employee survey upon which the decision to return to the 10-hour shift was based was completed in January 1994. The ALJ found that Mingo delayed implementation of the change until April in order to be able to continue to take advantage of cheaper Mahon labor before executing the layoff. Despite the Employers' contention that the real reason motivating the change was employee satisfaction, there is nothing in the record to suggest that the ALJ abused his discretion by rejecting their version of the events.

### 3.   *Evidence of Rehire Offer*

After the layoff, Mahon offered to rehire the employees. The Employers argue that the ALJ's refusal to admit this evidence is controlling on the issue of animus. The Board takes the position that this evidence is properly entertained during the compliance stage of the proceedings, rather than during the determination of liability. Br. of Board, at 51-52. According to the Board, this evidence may be introduced at compliance to determine questions such as tolling of backpay liability. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1014 (4th Cir. 1997). Furthermore, the Board argues that the offers were made after the unlawful layoff. Although the Employers dismiss the distance as trivial for the discharged laborers, the re-employment offers were made for work sites up to 45 miles from the Mine. Hence, the ALJ had substantial grounds to defer consideration of this evidence.

### 4.   *Joint-Employer Status*

As noted above, the determination of whether two employers are joint-employers for purposes of the imposition of liability under the

Act, regardless of payroll relationships to each others' employees, is a question of fact. Hence, we must review the ALJ's conclusion that Mingo and Mahon were joint employers for substantial evidence. The test for joint-employer status turns upon indicia of control. *See, e.g.*, *NLRB v. Jewell Smokeless Coal Corp.*, 435 F.2d 1270,1271 (4th Cir. 1970)(per curiam). Where one employer exercises meaningful forms of control over the employees of the other, notwithstanding independent contractor status, the Board may find joint employer status.

As discussed above, there is substantial evidence that Mingo exercised a great deal of control over Mahon employees. Mahon laborers were often directly supervised by Mingo supervisors. Mingo directed the hiring and often promotion of Mahon employees. Mingo even involved itself in the discipline of Mahon employees. The other examples of control discussed earlier more than suffice to show the influence Mingo exerted over Mahon. Mingo's only response to this overwhelming evidence is that the ALJ's opinion refers only to several isolated cases of joint control. Because the cases and evidence of domination developed by the Board are substantial, there is no real basis for challenging the ALJ's finding of joint-employer status.

Hence, as joint-employers, Mingo and Mahon were found to have been motivated by anti-union animus in their layoffs. The proffered non-discriminatory explanations were found to be pretextual by the ALJ. The ALJ's findings were supported by substantial evidence. The Employers' counter-arguments regarding the credibility of conflicting testimony and rehiring offers do not overcome the ALJ's findings. Hence, we affirm the ALJ's imposition of liability.

## B.   *THE REMEDY*

The Board has broad discretion to fashion remedies so long as they are not "arbitrary, capricious, or manifestly contrary to the statute." *ABF Freight System*, 510 U.S. at 324. The Employers object to the ALJ's remedial order because it requires Mingo to offer employment to all of the discharged Mahon employees. The ALJ adopted this remedy because he found that to not require Mingo to hire the laid-off Mahon employees would confer a benefit upon Mingo. That is, the ALJ found that the employees would probably have been hired eventually by Mingo given Mingo's hiring practices. The ALJ reasoned

that if only Mahon were required to rehire the employees, Mingo would benefit from their less costly, non-union labor. The Employers object that this measure is punitive and that they never had an opportunity to litigate whether the employees would ever have been hired by Mingo. Thus, they argue, the remedy places the discharged laborers in a better position than they would have been otherwise, which is contrary to the Board's remedial power and purposes of the Act. Br. of Employers, at 61-64.

The Board responds that although the ALJ made this recommendation, the Board reserved for compliance the issue of whether the employees would have been hired by Mingo. The Employers, the Board argues, will have an opportunity to address this factual question at the compliance stage of the litigation.

The statement relevant to determination of the meaning of the Board's order reads:

> We shall reserve for compliance the determination of when the employees would have been transferred to the Mingo Logan payroll, and thus when they would have begun receiving Mingo Logan wages and benefits, in the absence of the Respondents['] unlawful discrimination.

This text may certainly be read as the Employers suggest. The question is then whether there is substantial evidence in the record to support the assumption that all of the discharged employees would have been hired by Mingo. The Employers argue that the record cannot support such a determination because they never had a chance to litigate this issue. At most, the ALJ points to a few examples of employees who had hoped to be employed by Mingo, such as Evans. However, there is no real support in the record for a finding that the remainder would have received such offers.

The Board cites *NLRB v. Plumbers & Pipefitters Local Union No. 403*, 710 F.3d 1418, 1420-21 (9th Cir. 1983), for the proposition that where the Board acknowledges the necessity of additional proceedings regarding compliance, we should interpret the Board's order in light of the expressed reservation. In this case, the Ninth Circuit addressed an indefinite order, which left open the question of how

large an award, if any, each wrongfully discharged employee would receive. It was precisely upon this basis, the indefinite nature of the award, that the Ninth Circuit interpreted the order as permitting the parties to fully litigate issues of entitlement to compensation at compliance. Despite the Board's assertions to the contrary, the present remedial order is quite clear. Additionally, the Board's recognition of the need for compliance proceedings to ascertain the timing of hiring that it believed would have occurred, leaves little room for the Employers to litigate whether or not the employees would have received offers from Mingo. Accordingly, the present order is more analogous to that reviewed by the Ninth Circuit in *NLRB v. Fort Vancouver Plywood Co.*, 604 F.2d 596 (9th Cir. 1979). There, the court remanded part of an order requiring the reinstatement of laborers, which left no possibility for the employers to litigate whether the employees would have been laid off despite their violations. *Id.* at 1420. Here too, the order adopted by the Board leaves no opportunity for the Employers to contest *whether* employment would have been bestowed upon the employees, and instead assumes away this question reserving for compliance only an inquiry regarding *when* such a benefit would have been conferred. We therefore remand the order to the Board so that it may alter its remedy or order proceedings in which the Employers are afforded a full and fair opportunity to litigate the premise upon which it rests. *See Tri-Dent Seafoods, Inc. v. NLRB*, 101 F.3d 111, 116 (D.C. Cir. 1996).

## IV.   CONCLUSION

The ALJ's findings of liability rested upon substantial evidence of unfair labor practices by the Employers. The proposed remedy, however, should be clarified so that the Employers have an opportunity to litigate the issue of whether the employees would have been hired by Mingo. We therefore, affirm in part, remand in part.

*AFFIRMED IN PART, REMANDED IN PART*

NIEMEYER, Circuit Judge, concurring in the judgment:

While I cannot concur in the majority's opinion, I concur in its conclusion that the Board's findings that respondent violated §§ 8(a)(3) and 8(a)(1) of the National Labor Relations Act is sup-

ported by substantial evidence. I also concur in the conclusions that the Board's remedial order is overreaching.